**Shaner v. State System of Higher Education**

C.P. of Dauphin County, no. 1541 S 1989.

*Andrew Spirt,* for plaintiff.
*Jay Stark,* for defendants.

TURGEON, *J.,* October 28, 1998—Plaintiff Susan Shaner has filed a motion for post-trial relief from a court order entered September 15, 1998 in which I granted the Commonwealth defendants' motion for non-suit/directed verdict. The relevant factual background and legal issues were addressed in an opinion accompanying the September 15, 1998 order. Plaintiff has raised two new issues in her motion which were not previously addressed and which are the subject of this opinion: (1) The court improperly enforced the re-

lease/exculpatory clause against the minor plaintiff; and (2) the court improperly allowed defendants to amend their new matter on the eve of trial to add the affirmative defense of release/exculpatory clause.[1] Because we agree the release was improperly enforced against plaintiff, we grant plaintiff's post-trial motion and address the merits of the action.

The facts relevant to these two issues are as follows: plaintiff's mother, Shirley Shaner, initiated this action in her own right and on her daughter Susan Shaner's behalf in Philadelphia County on July 17, 1987. Plaintiffs sought recovery for a broken leg Susan Shaner suffered during a softball game at the 1985 Bloomsburg University summer softball camp. At the time of the injury, Susan was 14 years old. Defendants responded by filing preliminary objections. Prior to disposition of the objections, the parties entered a 1989 stipulation agreeing to a venue change to Dauphin County and withdrawal of the preliminary objections. Defendants filed their answer with new matter July 21, 1992 which did not include the affirmative defense of liability release. Plaintiffs answered defendants' new matter July 30, 1992.

In November 1994, plaintiff was notified by this court that her action was listed for termination due to inactivity. Plaintiffs objected to the proposed termination in February 1995. On March 29, 1995, I ordered that the parties complete all discovery and list the matter for trial by June 30, 1995, or face termination. In April 1995, new counsel entered his appearance on plaintiffs' behalf. Counsel proceeded to place the action on the

---

1. The third issue raised in plaintiff's post-trial motion, that the court improperly ruled the release/exculpatory clause was legally valid and enforceable, was thoroughly addressed in the earlier opinion.

trial list and initiated discovery for the first time. In addition, in July 1995, plaintiffs answered discovery requests which defendants had propounded in April 1993. Defendants, meanwhile, filed a non pros motion. The non pros issue was decided in plaintiffs' favor by December 1, 1995 order. Judge Lipsitt, writing for a panel of this court, stated "[t]his case involves a situation where there was a long delay by the plaintiff in pursuing the action. However, it is noted the plaintiff, a minor when injured, has moved forward with reasonable diligence since the appointment of present counsel." The case was again placed on the trial list in the fall of 1997. However, because plaintiff had earlier waived a right to jury trial, a non-jury trial was scheduled for April 24, 1998.[2]

On April 22, 1998, defendants filed a petition to amend their new matter to add the affirmative defense of release. The release was contained on the camp's registration form submitted by plaintiff and her father for camp enrollment. It stated as follows:

"I desire to enroll in the 1985 Bloomsburg University softball camp. Bloomsburg University, the director, and anyone connected with the clinic do not assume liability for any injuries incurred while at camp or on the way to and from camp. Parents should contact their own insurance company to get additional insurance for their daughter if necessary.

"Campers will be required to attend all sessions and must comply to all camp rules. Failure to do so may result in dismissal from camp. After an application is accepted there will be no refund of the $50 deposit.

"Parent's signature /s/Mahlon R. Shaner

---

2. By this time, plaintiff Shirley Shaner had been dropped from the action and Susan Shaner was the sole plaintiff.

"Student's signature /s/Suzy Shaner"

In their petition, defendants did not provide an explanation for the delay in seeking to add this new defense; however, they did note a copy of the release had been provided to plaintiff's counsel during discovery. I granted plaintiff's petition to amend on April 23, 1998 and the order was entered on the docket the next day. This was done prior to my receipt of plaintiff's answer, received and reviewed the next day. On April 24, 1998, just prior to trial, I agreed to bifurcate the hearing to allow plaintiff to examine her witnesses regarding the signing of the release since it had been added on the eve of trial. (N.T. 4-10.) Thereafter, Susan Shaner and her father were examined on the circumstances surrounding their signing of the release, following which the non-jury trial proceeded.

## I. POST-TRIAL MOTION

### *Whether Plaintiff Can Be Bound by a Release Signed As a Minor*

Plaintiff argues "her father cannot legally bind her to the clause and she did not understand or agree to it . . . ." In support, she cites the tolling statute which applies in cases where minors are entitled to bring civil actions and acts to toll the statutory limitations period until the minor reaches age 18. 42 Pa.C.S. §5533. Plaintiff argues that by analogy to this statute, minors cannot sign away any rights until they reach majority. Although the tolling statute has no relevance here, plaintiff has stumbled upon the law in Pennsylvania.

Except for contracts of necessity, a minor is not competent to enter into a valid contract.[3] Contracts with

___

3. "Any individual 18 years of age or older shall have the right to enter into binding and legally enforceable contracts and the defense

minors, while not void, are voidable upon the minor's disaffirmance after reaching the age of majority, rendering the contract a nullity. On the other hand, a minor can ratify or affirm such a contract after reaching majority, rendering the contract enforceable. See *Pankas v. Bell,* 413 Pa. 494, 498, 198 A.2d 312, 313 (1964); *Aetna Casualty & Surety Co. v. Duncan,* 972 F.2d 523, 526 (3d Cir. 1992) and *Simmons v. Parkette National Gymnastic Training Center,* 670 F. Supp. 140, 142 (E.D. Pa. 1987). A release is merely a certain type of contract and "a valid release is an absolute bar to recovery for everything included in the release, and it can only be set aside *as any contract . . .* in the presence of clear, precise and indubitable evidence of fraud, accidental means or *incompetence of the party who is alleged to have signed it." Simmons* (quoting *Mannke v. Benjamin Moore & Co.,* 375 F.2d 281, 285 (3d Cir. 1967) (emphasis from *Simmons)*). Thus, when plaintiff executed the release, she was incompetent and the release was voidable once she became an adult, upon her disaffirmance.

Furthermore, our independent research reveals that " '[u]nder Pennsylvania law, parents do not possess the authority to release the claims or potential claims of a minor child merely because of the parental relationship.' " *Simmons* at 143 (quoting *Apicella v. Valley Forge Military Academy,* 630 F. Supp. 20 (E.D. Pa. 1985)). See also, *Schmucker v. Naugle,* 426 Pa. 203, 204-205, 231 A.2d 121 (1967); *Campbell v. Sears, Roebuck & Co.,* 307 Pa. 365, 370-71, 161 A. 310 (1932); *Langdon v. Strawhecker,* 46 D.&C.2d 764, 766 (Mercer C.P. 1969) and *Swoyer v. Fenon,* 39 Northampton 166 (1969) (citing 24 P.L.E. Minors, §53). Thus, Mahlon Shaner's sig-

---

of minority shall not be available to such individuals." 23 Pa.C.S. §5101(a).

nature did not exculpate defendants from Susan Shaner's potential claims.

To void the contract, the minor must disaffirm it within a reasonable time after reaching majority. *Aetna Surety, supra; State Farm v. Skivington,* 28 D.&C.4th 358, 365 (Cumb. C.P. 1996). Plaintiff clearly disaffirmed the release at the time she attained majority in 1988 or 1989. At that time, she was pursuing her legal action in which she sought to hold defendants liable for the injury she incurred while at the softball camp, which is precisely the type of action from which the defendants sought to exculpate themselves (*i.e.,* under the release, the defendants "do not assume liability for any injuries incurred while at camp"). We can think of no clearer act of disaffirmance than to bring a legal action seeking the remedy from which the defendants had been purportedly released. *Haines v. Fitzgerald,* 108 Pa. Super. 290, 296-97, 165 A. 52 (1933) (act of minor in bringing suit after reaching majority was a disaffirmance of a release). Furthermore, plaintiff did not ratify or affirm the contract since ratification requires that she receive some benefit therefrom after attaining majority. Clearly, she received no benefit from the release. See *Pankas* at 498, 198 A.2d at 313; *Simmons* at 143-44.

## Amendment of New Matter

Plaintiff argues I improperly granted the petition to amend on the eve of trial. Upon further review, I agree. Rule of Civil Procedure 1033 permits amendments to pleadings "at any time." Pa.R.C.P. 1033. This rule has been interpreted to permit amendments "after pleadings are closed, while a motion for judgment on the pleadings is pending, at trial, after judgment, or after an award has been made and an appeal taken therefrom." *Capobianchi v. BIC Corp.,* 446 Pa. Super. 130, 134, 666

A.2d 344, 346 (1995), *appeal denied,* 544 Pa. 599, 674 A.2d 1065 (1996) (quoting *Biglan v. Biglan,* 330 Pa. Super. 512, 521, 479 A.2d 1021, 1025-26 (1984)). However, amendments are not permitted where they cause unfair surprise, prejudice or where the amendment is against positive rule of law. *Burger v. Borough of Ingram,* 697 A.2d 1037 (Pa. Commw. 1997).

I originally granted the petition to amend even though defendants had waited almost six years since filing their original answer (July 21, 1992 to April 22, 1998). Furthermore, defendants proffered no reason for the delay.[4] In so ordering, it did not appear delay alone had caused plaintiff any prejudice, and in any event, much of the delay in moving this case along had been attributable to plaintiff, as discussed *supra.*[5] More importantly, the issue of whether the release would apply in this case was purely a legal one, requiring a limited inquiry only as to whether plaintiff and her father had actually signed the release. Thus, the fact the amendment was offered after discovery had been completed was not an important consideration in allowing late amendment because only

4. Defendants may have simply overlooked the release language even though they had possession of the registration form early in the litigation. However, it is not improbable defendants made a strategic decision in seeking to amend on the eve of trial since the longer they waited to seek amendment—asserting exculpation pursuant to a release executed with a minor—the greater the chance the court might not find the minor disaffirmed the release, since disaffirmance requires the minor act within a reasonable time after reaching majority.

5. Plaintiff did not seriously pursue this action until early 1995 when prompted by a case termination notice. It was only at that point plaintiff undertook discovery for the first time. It is unclear from the record when discovery was completed, nevertheless, the actual delay attributable to defendants in failing to seek an amendment was considerably less than six years.

legal issues remained. The issue of plaintiff's minority, at the time she executed the release, did not occur to this court and obviously to the plaintiff as well, since she did not raise it until the present post-trial motion. It is precisely this example which warrants a different result; that indeed, late amendment would prejudice and unfairly surprise plaintiff since she was not given sufficient time to articulate her objection raising minority. In discussing the concept of prejudice resulting from amendment, the Supreme Court has stated as follows:

"All amendments have this in common: they are offered *later in time* than the pleading which they seek to amend. If the amendment contains allegations which would have been allowed inclusion in the original pleading (the usual case), then the question of prejudice is presented by the *time* at which it is offered rather than by the substance of what is offered. The possible prejudice, in other words, must stem from the fact that the new allegations are offered *late* rather than in the original pleading, and not from the fact that the opponent may lose his case on the merits if the pleading is allowed . . . ." *Bata v. Central-Penn National Bank of Philadelphia*, 448 Pa. 355, 380, 293 A.2d 343, 357 (1972), *cert. denied*, 409 U.S. 1108 (1973). (emphasis in original) (footnote omitted)

Upon reconsideration, it appears the time the amendment was offered, two days prior to trial, plaintiff would be and in fact was prejudiced wherein she did not have adequate time to research and raise her valid objection that the release did not apply because she executed it as a minor.

Accordingly, we must address the merits of the case, which I did not reach in the previous decision having ruled plaintiff had released defendants from liability.

## II. VERDICT

### *Liability*

In the previous opinion, I set forth plaintiff's version of the facts as follows: In 1985, plaintiff, an aspiring high school softball catcher, enrolled in the Bloomsburg University summer softball camp. The camp was under the direction of the Bloomsburg University's head softball coach Jan Hutchinson and staffed with Bloomsburg University employees, all Commonwealth agents of the State System of Higher Education. The one-week long camp was offered for experienced players who wished to sharpen their skills and earn college scholarships.

Fourteen-year-old plaintiff, between her 9th and 10th grade years, testified that on the last day of camp, July 19, 1985, she was scheduled to play in a final scrimmage. She stated the players carried the equipment to the field every day, including the bases. (N.T. 26.) Normally, the bases would be strapped to spikes placed in the ground each day; however, on this occasion, the coaches informed the players not to attach the bases to the field. Plaintiff testified this was probably done to save time because it took a couple of minutes per base. (N.T. 26-27, 30.) Plaintiff also testified the infield dirt was quite hard since it had not rained all week.

Plaintiff batted in the first inning and bunted toward the first base line. The first baseman fielded the ball and flipped it toward the second baseman who was covering the bag. As the second baseman placed her foot on the inside of the first base bag, the bag slipped out about one foot toward foul territory and her leg went directly into plaintiff's path, colliding with plaintiff's shin. (N.T. 33-35, 53.) Plaintiff suffered a fractured distal left tibia and fibula and was immediately transported to the hospital.

Defendants' version of the facts was as follows: Jan Hutchinson, Bloomsburg University's head softball coach, was the director of the 1985 summer softball camp which she has run since 1978. One of the camp's instructors was Denise Henderson, a 1984 Bloomsburg graduate and former softball player for Coach Hutchinson. Ms. Henderson was coaching the team playing against plaintiff's on the day of the incident. (N.T. 68.) She testified the bases were spiked into the ground prior to the start of play on that day since they were always spiked down prior to the start of play. The collision occurred because the second baseman straddled the first base bag and not because the bag moved. (N.T. 68-69.) She testified that normally the coaches or the equipment manager spiked the bases in and never the players; however, she herself had not spiked in the bases that day and did not recall who did. (N.T. 69, 72.)

Camp director Hutchinson testified that she arrived on the field shortly after learning of plaintiff's injury and attended to her. She testified that she noticed the first base bag was not dislodged. (N.T. 87.) She stated that during the 1985 camp, the equipment manager brought the equipment to the field, including the bases, and spiked them in and that the participants were not responsible for setting up any equipment. (N.T. 88, 100-101.). Furthermore, she stated it was her policy that the bases were always in place prior to the start of play. (N.T. 88.) Ms. Hutchinson admitted, however, she did not know for a fact the equipment manager had spiked the bases in that day and that she had not personally done it. (N.T. 91.) She did not learn that plaintiff alleged the accident was caused by a dislodged base until November 1985, when she learned of the Shaners' lawsuit. (N.T. 90.)

In December 1995, at her former coach's request, Ms. Henderson issued a short letter to the university in which she stated the bases were spiked into the ground prior to the start of play. In her letter, she volunteered that the collision occurred because the second baseman's leg was stretched across the first base bag and that the bag did not come out. (Def's exhibit 1.)

In order to recover damages, plaintiff must prove defendants' liability by a preponderance of evidence. We believe she has met this burden. All three witnesses appeared credible to this court; however, for a number of reasons, I find the testimony of plaintiff to have been the most credible—that on July 19, 1985, the first base bag did not get spiked into the ground and that when the second baseman placed her foot upon it, it slid towards the first base bag, causing the second basemen to slip into plaintiff's path, breaking her leg.

First, plaintiff had a fairly clear recollection of the events surrounding this incident since it was a life-altering event. She specifically remembered that the bases were not attached to their spikes on July 19, 1985, because the coaches chose not to attach them, probably to save time. In addition, plaintiff also specifically recalled that as she was running out her first inning bunt, she saw the first base bag slide out in front of her path, causing the collision.

On the other hand, the defendants, who were certain the bases had been spiked in, failed to present any witness who could identity the person who allegedly performed this duty.[6] Neither Hutchinson nor Henderson

6. Although trial occurred almost 13 years following the incident, defendants were aware in November 1995, four months after the accident, that Susan Shaner was alleging the base had not been attached to its spike.

had personal knowledge of this person and only Henderson was an eyewitness to the collision. Furthermore, we call into question Henderson's certainty that the bases were all attached and that first base did not move during plaintiff's collision. She first articulated this certainty in the December 1985 letter she volunteered to write at Hutchinson's behest. (Def's exhibit 1.) She denied having been informed prior to writing her letter that the Shaners were alleging the base had not been attached to its spike. (N.T. 81.) Since the issue of an unspiked bag had not previously been raised to her and since she believed the bases were always spiked, it seemed noteworthy to this court that she would volunteer in her letter that the base was spiked and did not move during the collision.

Furthermore, there was a slight but important inconsistency between Hutchinson and Henderson as to who was responsible for attaching the bases. Camp director Hutchinson stated that at the 1985 summer camp, the equipment manager was responsible for attaching the bases.[7] (N.T. 101.) Instructor Henderson stated that it was either the coaches or equipment manager who attached the bases. (N.T. 69.) Thus, according to Hutchinson, the coaches were often delegated this responsibility. This bolsters plaintiff's testimony that the coaches could make the decision whether or not to attach the bases and weakens Hutchinson's testimony that the bases were always spiked in prior to the players taking the field.

While we do not doubt that defendants' witnesses truly believed the first base bag was securely attached

---

7. Hutchinson did testify that as a last resort, she or the coaches would attach the bags if the equipment manager had not; however, her testimony indicates it was clearly the primary responsibility of the equipment manager. (N.T. 101.)

to its spike on July 19, 1985, we find plaintiff's specific recollection that it was not more compelling.

## *Damages*

Following her injury, plaintiff was taken by ambulance to Bloomsburg Hospital and placed in a fiberglass hip cast. (N.T. 40.) Later that day, plaintiff's father drove her to a hospital near her home where her leg was reset in a plaster cast. She was confined to bed for five weeks and was in considerable pain. After five weeks, she was able to use crutches. (N.T. 41.). Her fibula healed by October 1985 and her tibia by February 1986. (N.T. 56.) She was in hard casts for a total of 16 weeks and later wore a fracture brace for 15-16 weeks, whereafter, she finally began weight-bearing activities. (N.T. 41, 43.) She claimed to have been embarrassed during her sophomore year because she had to use a chair lift and was unable to spend time with her friends. (N.T. 50.)

In early 1986, plaintiff's treating physician informed her she could resume physical activities but nothing strenuous, including being a softball catcher. (N.T. 44.) She was unable to play softball in spring 1986 (her sophomore year) and continued to experience weakness in her leg, ankle stiffness and fatigue. (N.T. 45.) She attempted but failed to make the softball team as a junior. She attended physical therapy in summer 1987 and the problems mostly resolved. She was finally able to play her senior year as the second-string catcher but described herself as not nearly as good. (N.T. 48-49.) Plaintiff claimed to have lost a lot of agility as well as love for the sport. (N.T. 49.) She attempted to play catcher in college but had to quit because of ankle problems. (N.T. 49-50.) At the time of trial, she still had some residual problems with her ankle, numbness in her toes, lack of balance and pain during inclement weather. (N.T. 46-47.) Her treating physician opined in 1995 that plaintiff had "made a very good recovery . . . has some mild residuals which will be permanent,

but fortunately these residuals will not interfere with the vast majority of normal activities." (Plt's exhibit 1.) Her total medical expenses were $6,859.50.

Under the circumstances, I find plaintiff should be awarded damages in the amount of $80,000. Of particular importance in so deciding is the fact plaintiff was bedridden and in considerable pain for about five weeks and had to wear a cast and/or a brace for almost eight months. Furthermore, she was severely limited in her ability to get around during her sophomore year in high school and was unable to resume her softball career until her senior year, and then as the second-string catcher.

Accordingly, we enter the following:

### ORDER

And now, October 28, 1998, it is directed that:

(1) Plaintiff's motion for post-trial relief is hereby granted. The order of September 15, 1998, granting defendants' nonsuit/directed verdict motion is accordingly vacated.

(2) A verdict on the merits of the action is hereby entered in favor of plaintiff Susan Shaner and against the Commonwealth defendants in the amount of $80,000.