FILED

01/09/2017

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 16, 2016 Session

## CRYSTAL BLACKWELL, AS NEXT FRIEND TO JACOB BLACKWELL, A MINOR v. SKY HIGH SPORTS NASHVILLE OPERATIONS, LLC.

**Appeal from the Circuit Court for Davidson County**
**No. 14C524   Thomas W. Brothers, Judge**

_____

**No. M2016-00447-COA-R9-CV**

_____

In this interlocutory appeal, the defendant trampoline park argues that the trial court erred by refusing to enforce a forum selection clause, a choice of law provision, and a waiver of liability and indemnity clause against the minor plaintiff. Additionally, the minor plaintiff argues that the trial court erred in denying his motion to alter or amend his complaint to allow him to claim pre-majority medical expenses. We reverse the trial court's denial of the minor plaintiff's motion to amend only to the extent that the minor plaintiff may be permitted to assert pre-majority medical expenses that were paid by him or that he is legally obligated to pay. We affirm the trial court in all other respects. Affirmed in part, reversed in part, and remanded.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court Affirmed in Part; Reversed in Part; and Remanded**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and BRANDON O. GIBSON, J., joined.

David J. Weissman, Nashville, Tennessee, for the appellant, Crystal Blackwell, as next friend of Jacob Blackwell, a minor.

Ben M. Rose and Joshua D. Arters, Brentwood, Tennessee, for the appellee, Sky High Sports Nashville Operations, LLC.

**OPINION**

**Background**

On July 3, 2012, Plaintiff/Appellant Crystal Blackwell ("Mother") signed a contract entitled "Customer Release of Liability and Assumption of Risk" ("the release") with Defendant/Appellee Sky High Sports Nashville Operations, LLC ("Sky High") in order for her son, Jacob Blackwell ("Son," and, as represented by Mother as next friend in this lawsuit, "Appellants") to participate in activities at an indoor trampoline park operated by Sky High. The release included a forum selection clause designating California as the proper forum for litigation, a choice of law provision stipulating California as the applicable law governing the contract, and a liability waiver on behalf of both Mother and Son, as discussed in detail *infra*. The release further provided that it would remain in effect for any future visits to Sky High until Son turned eighteen. Mother and Son returned to Sky High to participate in trampolining activities on multiple occasions after Mother signed the contract. On March 26, 2013, Son was allegedly injured at Sky High while participating in a trampoline dodgeball tournament.

On February 5, 2014, Appellants filed a complaint in the Davidson County Circuit Court against "Sky High Sports Nashville, LLC." The complaint alleged that Son moved in an awkward fashion on a trampoline to dodge the ball and landed "awkwardly," that another player's "double bounce" contributed to his awkward landing, and that Son suffered from a torn patellar tendon and broken tibia as a result, necessitating surgery. According to Appellants, Sky High "knew or should have known that playing dodgeball on a trampoline was a very dangerous activity" and therefore was guilty of negligence. The complaint further alleged that any warnings, disclaimers, or waivers of liability signed by Mother were "void, invalid, and/or inadequate." The complaint sought damages, including past medical expenses, future medical expenses, pain and suffering, emotional injury and suffering, loss of enjoyment of life, lost wages, and loss of consortium in the amount of $500,000.00.

On May 5, 2014, Sky High Sports Nashville, LLC filed an answer denying the material allegations contained in the complaint. In addition, Sky High Sports Nashville, LLC raised several affirmative defenses: (1) that Sky High Sports Nashville, LLC was not the proper party; (2) that pursuant to the parties' contract, California was the proper forum and California law was applicable to the dispute; and (3) that Appellants' claims were barred by the release signed by Mother individually and on Son's behalf. On November 3, 2014, Sky High was substituted as the proper defendant by agreement of the parties and an amended complaint was filed reflecting the change.

On March 17, 2015, Sky High filed its motion to enforce the contract between the parties. The motion first argued that any claims on behalf of Mother should be dismissed because the release contained a forum selection clause, a choice of law provision, and a waiver of liability, all of which were enforceable against Mother. Sky High also argued that the forum selection clause, choice of law provision, and liability waiver should be enforced against Son as well, despite "dated Tennessee authority to the contrary" which did "not reflect the current state of the law." In sum, Sky High offered the following various alternative methods for resolving this dispute: (1) that the trial court should

dismiss the case based on the forum selection clause; (2) that the trial court retain jurisdiction but apply California law; or (3) that the trial court should enforce the release's liability waiver and dismiss the case as to both Mother and Son.

Appellants filed a response to the motion to enforce on May 4, 2015. Therein, Appellants argued that the forum selection clause and choice of law provision were invalid because the dispute involved in this case has no connection to California. Appellants also asserted that based upon this Court's decision in *Childress v. Madison County*, 777 S.W.2d 1 (Tenn. Ct. App. 1989), a parent may not effectively waive liability on behalf of a minor. The response offered no argument, however, that the release of liability did not apply to any claims on behalf of Mother. Accordingly, on the same day, Mother filed a notice of voluntary dismissal of her claims against Sky High.

In response to Appellants' contention that the dispute in this case had no connection with California, Sky High filed the affidavit of Rolland Weddell on May 6, 2015. In his affidavit, Mr. Weddell asserted that he helped found Sky High Sports, "a larger national brand" of which Sky High was a part. According to Mr. Weddell, the company's first two stores were founded in California in 2006. Mr. Weddell explained that ten trampoline parks under the Sky High Sports brand currently operate in California. Mr. Weddell, however, resides in Nevada, where he serves as the loss prevention manager for Sky High. There is no dispute that Sky High's corporate headquarters is also in Nevada.

The trial court held a hearing on Sky High's motion to enforce on May 8, 2014. On May 22, 2015, the trial court entered an order denying Sky High's motion to enforce in its entirety. Therein, the trial court ruled that neither the forum selection clause nor the choice of law provision were valid because their enforcement would cause a great hardship for Son to prosecute his action in California and, Tennessee, rather than California, has "a more significant relationship to the facts surrounding this case." The trial court also noted that Tennessee law included a fundamental public policy regarding the protection of children. Consequently, the trial court denied Sky High's request to enforce the waiver of liability as to the Son's claims, noting that such a contract is not permissible in Tennessee under the holding in *Childress*.

On June 22, 2015, Sky High filed a motion to alter or amend the trial court's judgment, or in the alternative, for an interlocutory appeal of the trial court's denial of the motion to enforce pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. While this motion was pending, on July 31, 2015, Appellants filed a motion to amend their complaint. Therein, Appellants contended that because the individual claims of Mother had been voluntarily dismissed, an amendment was necessary to ensure the proper parties were named in the complaint and to request medical expenses, both past and future, on behalf of Son, with Mother acting as next friend. Sky High opposed the amendment, arguing that only a parent could bring a claim for past medical expenses for

a minor child. Sky High contended that, because Mother's claims were barred by the release, neither Mother nor Son was entitled to recover these damages.

On February 23, 2016, the trial court entered an order on the pending motions to amend the complaint and to alter or amend, or in the alternative, for an interlocutory appeal. First, the trial court denied Sky High's motion to alter or amend but granted their request for an interlocutory appeal of the denial of the motion to enforce. Additionally, the trial court granted Appellants' motion to alter or amend, except to the extent that the amendment would allow "recovery of any pre-majority medical expenses." The trial court, however, also allowed an interlocutory appeal of this ruling. Eventually, this Court also granted the requested interlocutory appeal as to both issues. Accordingly, this appeal followed.

## Issues Presented

As we perceive it, this appeal involves four issues:

1. Whether the trial court erred in refusing to enforce the forum selection clause contained in the release?
2. Whether the trial court erred in refusing to enforce the choice of law provision contained in the release?
3. Whether the trial court erred in refusing to enforce the waiver of liability against Son contained in the release signed by Mother?
4. Whether the trial court erred in refusing to allow the amendment to the complaint to allow Son to recover for pre-majority medical expenses.

## Standard of Review

In this case, the trial court denied Sky High's motion to dismiss based upon a forum selection clause, a choice of law provision, and a liability waiver contained in the release. In considering an appeal from a trial court's ruling on a motion to dismiss, we take all allegations of fact in the complaint as true and review the trial court's legal conclusions de novo with no presumption of correctness. *Mid-South Industries, Inc. v. Martin Mach. & Tool, Inc.*, 342 S.W.3d 19, 27 (Tenn. Ct. App. 2010) (citing *Owens v. Truckstops of America*, 915 S.W.2d 420, 424 (Tenn. 1996)); *see also Stevens ex rel. Stevens v. Hickman Cmty. Health Care Servs.*, Inc., 418 S.W.3d 547, 553 (Tenn. 2013) (citing *Graham v. Caples*, 325 S.W.3d 578, 581 (Tenn. 2010)) ("The trial court's denial of [d]efendants' motions to dismiss involves a question of law, and, therefore, our review is de novo with no presumption of correctness.").

In addition, the trial court denied Appellants' motion to amend their complaint. A trial court's decision to deny a motion to amend a complaint is reviewed under an abuse of discretion standard. *Merriman v. Smith*, 599 S.W.2d 548, 559 (Tenn. Ct. App. 1979).

## Discussion

## I.

We begin first by considering whether the trial court erred in refusing to dismiss Appellants' complaint on the basis of the forum selection clause contained in the release, or in the alternative, in refusing to apply California law to this dispute. The release signed by Mother on behalf of Son contains the following language: "In the event that I file a lawsuit against Sky High [], I agree to do so solely in the state of California and I further agree that the substantive law of California shall apply in that action without regard to the conflict of law rules of that state."

The trial court did not rule that the forum selection and choice of law provisions were unenforceable because the release containing them was signed by Mother on behalf of Son, as is true of the liability waiver discussed in detail *infra*; instead, the trial court ruled that the forum selection and choice of law provisions were unenforceable based upon the Tennessee framework regarding provisions of this type. Likewise, in their reply brief to this Court, Appellants do not assert that the forum selection and choice of law provisions are unenforceable against Son simply due to the fact that the provisions were included in a contract signed by Mother on behalf of Son. Rather, Appellants assert that the trial court correctly determined that California has so little interest in this case and litigating in California would be substantially less convenient than in Tennessee so as to militate against enforcement of both the forum selection and choice of law provisions. Accordingly, we assume arguendo for purposes of this appeal that both the forum selection clause and choice of law provision are binding against Son unless otherwise rendered unenforceable by Tennessee law. We therefore first proceed to address whether Tennessee law renders the forum selection clause unenforceable in this case.

## A.

Generally, a forum selection clause is enforceable and binding on the parties entering into the contract. *Lamb v. MegaFlight, Inc.*, 26 S.W.3d 627, 631 (Tenn. Ct. App. 2000). A forum selection clause will be upheld if it is fair and reasonable in light of all the circumstances surrounding its origin and application. *Id.* (citing *Dyersburg Mach. Works, Inc. v. Rentenbach Eng'g Co.*, 650 S.W.2d 378 (Tenn. 1983)). According to the Tennessee Supreme Court, a court must give effect to a forum selection clause and refuse to entertain the action unless:

> (1) the plaintiff cannot secure effective relief in the other state, for reasons other than delay in bringing the action; (2) or the other state would be a substantially less convenient place for the trial of the action than this state; (3) or the agreement as to the place of the action was obtained by misrepresentation, duress, abuse of economic power, or other unconscionable means; (4) or it would for some other reason be unfair or unreasonable to enforce the agreement.

*Dyersburg*, 650 S.W.2d at 380 (quoting *The Model Choice Forum Act of 1968*). The *Dyersburg* Court further stated that Tennessee courts should give consideration to the above factors and should enforce a forum selection clause unless the party challenging the clause demonstrates that enforcement would be unfair or inequitable. *Id.* Our research demonstrates that the factors promulgated by the *Dyersburg* Court have been followed in numerous subsequent cases. *E.g.*, *Cohn Law Firm v. YP Se. Advert. & Publ'g, LLC*, No. W2014-01871-COA-R3-CV, 2015 WL 3883242, at *11 (Tenn. Ct. App. June 24, 2015); *Sevier Cnty. Bank v. Paymentech Merch. Servs.*, No. E2005-02420-COA-R3-CV, 2006 WL 2423547 (Tenn. Ct. App. Aug. 23 2006); *Spell v. Labelle*, No. W2003-00821-COA-R3-CV, 2004 WL 892534 (Tenn. Ct. App. Apr. 22, 2004); *Signal Capital*, No. E2000-00140-COA-R3-CV, 2000 WL 1281322 (Tenn. Ct. App. Sept. 7, 2000); *Tennsonita (Memphis), Inc. v. Cucos, Inc.*, No. 36, 1991 WL 66993 (Tenn. Ct. App. May 2, 1991). Tennessee law is clear, however, that the party challenging the enforcement of the forum selection clause "should bear a heavy burden of proof." *Chaffin v. Norwegian Cruise Line Ltd.*, No. 02A01-9803-CH-00080, 1999 WL 188295, *4 (Tenn. Ct. App. Apr. 7, 1999).

We first note that there are no allegations in this case that the forum selection clause at issue was "obtained by misrepresentation, duress, abuse of economic power, or other unconscionable means[.]" *Dyersburg*, 650 S.W.2d at 380. We agree with both Appellants and the trial court, however, that, with respect to the second *Dyersburg* factor, California is a substantially less convenient place to hold this lawsuit. We recognize that a "party resisting a forum selection clause must show more than inconvenience or annoyance[.]" *ESI Cos., Inc. v. Ray Bell Constr. Co.*, No. W2007-00220-COA-R3-CV, 2008 WL 544563, at *7 (Tenn. Ct. App. Feb. 29, 2008). Accordingly, mere increased litigation expenses will be insufficient to invalidate a forum selection clause. Still, the Tennessee Supreme Court has previously held that where neither company at issue was a resident of the proposed forum and none of the witnesses were residents of the proposed forum, the party resisting a forum selection clause had met its burden to show that the proposed forum was a substantially less convenient forum. *See Dyersburg*, 650 S.W.2d at 381 (holding that the second factor was met because the chosen forum of Kentucky was "a substantially less convenient place for trial . . . wherein all witnesses are Tennessee residents, the plaintiffs and the defendants, . . . are Tennessee corporations").

The same is true in this case. Here, Mother and Son are Tennessee residents. Moreover, the alleged injury to Son and his later treatment all occurred in Tennessee. It thus appears that Appellants' witnesses to both the alleged negligence and later treatment may all be found in Tennessee. On the other hand, Sky High has not presented this Court with any prospective witnesses regarding the events at issue in this case that are California residents. While it is true that Sky High is not a Tennessee corporation, as were the corporations in *Dyersburg*, nothing in the record suggests that Sky High is incorporated or has its principal place of business in California, the forum designated in the release. Rather, the only information in the record indicates that Sky High has its

headquarters in Nevada. Instead, from the affidavit of Mr. Weddell, we discern that Sky High's limited contact with California involves only that the "larger brand" under which Sky High operates was founded in California over a decade ago and now operates several facilities in California. Respectfully, a decades-old contact by a parent company with a state and the operation of several trampoline parks in a state is insufficient to undermine Appellants' contentions regarding the inconvenience that would be posed by litigating in California. Accordingly, we hold that Appellants have met their burden to show that California presents a substantially less convenient forum than Tennessee.

We also agree that, with respect to the first and fourth *Dyersburg* factors, California is unlikely to provide Son with effective relief and that forcing Son to litigate in California would otherwise be unfair. As discussed in detail *infra*, Tennessee law and California law differ as to whether waivers of liability signed by parents may be enforced as to their children. *Compare **Childress v. Madison Cnty.***, 777 S.W.2d 1 (Tenn. Ct. App. 1989) (refusing to enforce such a waiver), *with **Hohe v. San Diego Unified Sch. Dist.***, 224 Cal. App. 3d 1559, 274 Cal. Rptr. 647 (Ct. App. 1990) (enforcing such a waiver). Because we reaffirm Tennessee law that parents cannot effectively sign pre-injury waivers on behalf of their children, as discussed in detail *infra*, allowing Son to litigate his case in Tennessee provides him with a better opportunity for full relief.

**B.**

We next consider whether the trial court erred in refusing to enforce the release's choice of law provision indicating that California law should apply to this case. Generally, absent a choice of law provision in a contract, "Tennessee follows the rule of *lex loci contractus*. This rule provides that a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent." ***Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.***, 131 S.W.3d 457, 474–75 (Tenn. Ct. App. 2003) (quoting ***Vantage Tech., LLC v. Cross***, 17 S.W.3d 637, 650 (Tenn. Ct. App. 1999)). As this Court explained:

> If the parties manifest an intent to instead apply the laws of another jurisdiction, then that intent will be honored provided certain requirements are met. The choice of law provision must be executed in good faith. ***Goodwin Bros. Leasing, Inc. v. H & B Inc.***, 597 S.W.2d 303, 306 (Tenn. 1980). The jurisdiction whose law is chosen must bear a material connection to the transaction. *Id.* The basis for the choice of another jurisdiction's law must be reasonable and not merely a sham or subterfuge. *Id.* Finally, the parties' choice of another jurisdiction's law must not be "contrary to 'a fundamental policy' of a state having [a] 'materially greater interest' and whose law would otherwise govern." *Id.*, n.2 (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2) (1971)).

*Messer Griesheim*, 131 S.W.3d at 475 (quoting *Vantage*, 17 S.W.3d at 650).[1]

Here, there is no allegation that the choice of law provision at issue was not executed in good faith. Instead, the choice of law provision fails for largely the same reason that the forum selection clause fails: no material connection exists between the transaction at issue and California. As previously discussed, the contract at issue was signed in Tennessee, between Tennessee residents and a Nevada company, concerning activities taking place in Tennessee. *Black's Law Dictionary* defines "material" as "[h]aving some logical connection with the consequential facts." *Black's Law Dictionary* 1066 (9th ed. 2009). The simple fact that Sky High's parent company was founded in California over a decade ago and now operates several facilities there is simply not sufficient to show a logical connection to the transaction at issue in this case.

We do not disagree with Sky High's assertion that it is reasonable and generally enforceable for a company to "limit where it is subject to suit." Tennessee law is clear, however, that a company's choice of law provision will only be honored where the proposed state's law has a material connection to the transaction at issue. *See Messer Griesheim*, 131 S.W.3d at 475. Furthermore, the cases that Sky High cites for this proposition do not support their argument in this case. First, in *Bright v. Spaghetti Warehouse, Inc*., No. 03A01-9708-CV-00377, 1998 WL 205757 (Tenn. Ct. App. Apr. 29, 1998), the Court of Appeals enforced a choice of law provision designating that Texas law would apply to the contract where the contract was largely negotiated in Texas and the defendant was a Texas corporation. *Id.* at *5. As such, the transaction at issue in *Bright* had far more contact with the state whose law was named in the contract than is present in this case. Even more puzzling, *Thomas v. Costa Cruise Lines N.V.*, 892 S.W.2d 837 (Tenn. Ct. App. 1994), does not involve either a choice of law provision or the application of Tennessee law to determine its enforceability; rather, *Thomas* involves a forum selection clause, whose enforcement was governed by federal law. *Id.* at 840. Accordingly, the trial court did not err in denying Sky High's request to enforce the choice of law provision on this basis. Because the contract's choice of law provision is unenforceable, the general rule of *lex loci contractus* applies in this case. *See Messer Griesheim*, 131 S.W.3d at 474. As such, Tennessee law, as the law of the place where the contract was executed, governs the dispute in this case.

**II.**

---

[1] Sky High asserts that the party seeking to invalidate a choice of law provision bears a "heavy burden," citing *Security Watch, Inc. v. Sentinel Systems, Inc.*, 176 F.3d 369 (6th Cir. 1999). First, we note that a federal decision, even when interpreting Tennessee law, is not binding on this Court. *See Elias v. A & C Distrib. Co., Inc.*, 588 S.W.2d 768, 771 (Tenn. Ct. App. 1979) ("[D]ecisions of [ f]ederal . . . [c]ourts are not binding authority upon this Court and other State Courts in Tennessee[.]"). Furthermore, the phrase "heavy burden" as quoted by Sky High simply does not appear in the *Security Watch* Opinion. *See Security Watch*, 176 F.3d at 375. Finally, we note that the *Security Watch* Opinion does not concern a choice of law provision, but rather, a forum selection clause. *Id.*

Having determined that this case has been properly brought in a Tennessee court and that Tennessee law applies, we next consider whether the trial court erred in refusing to enforce the waiver of liability and the indemnity language contained in the release pursuant to Tennessee law. Here, the contract at issue contains the following language, in relevant part:

3. I hereby voluntarily release, forever discharge, and agree to defend indemnify and hold harmless [Sky High] from any and all claims, demands, causes of action, which are in any way connected with my participation in this activity or any use of [Sky High's] equipment or facilities, including any such claims which allege negligent acts or omissions of [Sky High].

4. Should [Sky High] or anyone acting on their behalf, be required to incur attorney's fees and costs to enforce this agreement, I agree to indemnify and hold them harmless for all such fees and costs. This means that I will pay all of those attorney's fees and costs myself.

5. I certify that I have adequate insurance to cover any injury or damage that I may cause or suffer while participating, or else I agree to bear the costs of such injury or damage myself. I further certify that I am willing to assume the risk of any medical or physical condition that I may have.

* * *

8. **If the participant is a minor, I agree that this Release of Liability and Assumption of Risk agreement ("RELEASE") is made on behalf of that minor participant and that all of the releases, waivers and promises herein are binding on that minor participant. I represent that I have full authority as Parent or Legal Guardian of the minor participant to bind the minor participant to this agreement.**

9. If the participant is a minor, I further agree to defend, indemnify and hold harmless SKY HIGH SPORTS from any and all claims or suits for personal injury, property damage or otherwise, which are brought by, or on behalf of the minor, and which are in any way connected with such use or participation by the minor, including injuries or damages caused by the negligence of [Sky High], except injuries or damages caused by the sole negligence or willful misconduct of the party seeking indemnity.

(Emphasis added).

In the trial court, Sky High argued that the above language constituted a legal and enforceable waiver of liability and indemnity agreement against both the claims brought by Mother and the claims brought on behalf of Son. There is no dispute in this case that "parties may contract that one shall not be liable for his negligence to another but that such other shall assume the risk incident to such negligence." *Moss v. Fortune*, 207 Tenn. 426, 429, 340 S.W.2d 902, 903–04 (Tenn. 1960). These types of agreements, however, are subject to some important exceptions, such as waivers involving gross negligence or willful conduct or those involving a public duty. *Id.* at 904. These types of provisions must also be clear and unambiguous. *See* *Pitt v. Tyree Org. Ltd.*, 90 S.W.3d 244, 253 (Tenn. Ct. App. 2002) (citing *Kroger Co. v. Giem*, 215 Tenn. 459, 387 S.W.2d 620 (Tenn. 1964)).

Here, Appellants do not argue, nor did the trial court find, that the liability waiver above was unenforceable on its face against Mother pursuant to the above law. Rather, the trial court found that the waiver of liability was ineffective to waive Son's claims due to Tennessee public policy, as expressed in this Court's Opinion in *Childress v. Madison County*, 777 S.W.2d 1 (Tenn. Ct. App. 1989). A brief discussion of the facts and holding in *Childress* is therefore helpful.

### A.

In *Childress*, the parents of a young man with severe intellectual disabilities brought suit on behalf of their son. According to the parents, the young man, who was twenty years old at the time of the accident, was injured while training for the Special Olympics in connection with his school. *Id.* at 2. Specifically, while on a trip to a local YMCA supervised by a teacher and aide from the Madison County school district, the young man was found on the floor of the YMCA pool. The young man was successfully resuscitated but sustained injuries and incurred medical expenses as a result of the incident. *Id.*

The parents, individually and on behalf of their son, sued Madison County and the Madison County Board of Education for negligence in failing to properly supervise the students in the pool. After a bench trial, the trial court ruled in favor of the defendants, finding that they had committed no negligence. The parents thereafter appealed to this Court. *Id.*

This Court first reversed the trial court's finding that the defendants had not committed negligence in failing to supervise the young man while he was in the pool. *Id.* at 3. The defendants argued, however, that even if they were guilty of negligence, any liability had been waived by parents when the mother "executed a release of all liability of these defendants." *Id.* at 3. In response, the parents argued, *inter alia*, that the waiver was unenforceable because it was against Tennessee public policy to allow parents or guardians to release the claims of incompetent persons. *Id.* at 6–7.

- 10 -

The Court of Appeals, in what the concurrence characterized as an "excellent opinion," agreed that the parents could not release the claims of their incompetent son. *Id.* at 8 (Tomlin, J., concurring). The *Childress* Court first noted that the adult son had not personally signed the release but that, instead, his mother had signed the document. *Id.* at 6. The Court held that had the young man signed the release, it would certainly have been invalid, as the young man was "incompetent, incapable of understanding the nature of his action, [and, thus,] the execution could not be given effect." *Id.* (citing 44 C.J.S. *Insane Persons* § 49 (1945)). The question was therefore whether the mother's action in signing the form, which included an indemnity agreement and an assumption of risk clause that were applicable to the son's claims, were sufficient to bar the young man's claims.[2]

In reaching its decision, the *Childress* Court analogized "the status of guardians of incompetent persons" with "that of guardians of infants" under well-settled Tennessee law. *Id.* According to the Court:

> The general rule is that a guardian may not waive the rights of an infant or an incompetent. 39 Am. Jur. 2d, *Guardian & Ward* § 102 (1968); 42 Am. Jur. 2d, *Infants* § 152 (1969). Specifically, the Supreme Court of Tennessee long ago stated that a guardian cannot settle an existing claim apart from court approval or statutory authority. *Miles v. Kaigler*, 18 Tenn. (10 Yerg.) 10 (1836)[;] *Spitzer v. Knoxville Iron, Co.*, 133 Tenn. 217, 180 S.W. 163 (1915)[;] *Tune v. Louisville & Nashville Railroad Co.*, 223 F. Supp. 928 (M[.]D[.] Tenn. 1963). It has also been held that a guardian may not waive the statutory requirements for service of process on an infant or incompetent by accepting service of process on himself alone. *Winchester v. Winchester*, 38 Tenn. (1 Head) 460 (1858).[³]

---

[2] In *Childress*, this Court held that by the contract's own terms, the waiver of liability only applied to the mother. *Id.* at 6 ("[T]here is no indication in the language of the form or in the manner in which [the mother] signed that she did in fact . . . release or discharge the Special Olympics on [her son's] behalf"). The Court of Appeals therefore affirmed the trial court's dismissal of the mother's individual claims. The Court held, however, that the contract provided that both the indemnity clause and assumption of risk provision applied to both the mother and the son. *Id.* ("[The mother] did clearly agree to indemnify the Special Olympics 'from all liabilities for damage, injury or illness to the entrant or his/her property during his/her participation in or travel to or from any Special Olympics event.' . . . [A]ccording to the language of the release, [the mother], as his mother and natural parent, acknowledged on [her son']s behalf that he would be participating at his own risk.").

[3] We note that this statement was supported by what appears to be an incorrect citation to authority. *See Watterson v. Watterson*, 38 Tenn. 1, 2 (1858) (not involving an infant or service of process); *Winchester v. Winchester*, 23 Tenn. 51, 51 (1843) (same). Regardless, the *Childress* Court is correct as to this

- 11 -

*Childress*, 777 S.W.2d at 6.

The *Childress* Court then considered the decisions of other states that also refused to enforce waivers made on behalf of minors or incompetent persons. *See id.* at 6–7 (citing *Gibson v. Anderson*, 265 Ala. 553, 92 So. 2d 692, 695 (1956) (legal guardian's acts do not estop ward from asserting rights in property); *Ortman v. Kane*, 389 Ill. 613, 60 N.E.2d 93, 98 (1945) (guardian cannot waive tender requirements of land sale contract entered into by ward prior to incompetency); *Stockman v. City of South Portland*, 147 Me 376, 87 A.2d 679 (1952) (guardian cannot waive ward's property tax exemption); *Sharp v. State*, 240 Miss. 629, 127 So.2d 865, 90 A.L.R.2d 284 (1961) (guardian cannot waive statutory requirements for service of process on ward); *Jones v. Dressel*, 623 P.2d 370 (Colo.1981) (ratification by parent of contract executed by child does not bind child); *Whitcomb v. Dancer*, 140 Vt. 580, 443 A.2d 458 (1982) (guardian cannot settle personal injury claim for a ward without court approval); *Natural Father v. United Methodist Children's Home*, 418 So.2d 807 (Miss. 1982) (infant not bound by evidentiary admissions of parent); *Colfer v. Royal Globe Ins. Co.*, 214 N.J.Super. 374, 519 A.2d 893 (1986) (guardian cannot settle personal injury claim for ward without court approval)). This Court found the decisions of three states particularly helpful. First, the Court noted that the Mississippi Supreme Court had previously "expressed in broad terms" that under Mississippi law: "'Minors can waive nothing. In the law they are helpless, so much so that their representatives can waive nothing for them.'" *Childress*, 777 S.W.2d at 7 (quoting *Khoury v. Saik*, 203 Miss. 155, 33 So.2d 616, 618 (Miss. 1948)). Further, the Court cited with approval the Supreme Court of Connecticut, which held that "an agreement, signed by one of the parents of a minor as a condition to his being allowed to attend a camp, waiving the minor's claims against a camp for damages in the event of an injury was ineffective to waive the rights of the minor against the defendant camp." *Childress*, 777 S.W.2d at 7 (citing *Fedor v. Mauwehu Council, Boy Scouts of America*, Inc., 21 Conn. Sup. 38, 143 A.2d 466, 468 (1958)). Finally, the *Childress* Court also noted that the Maine Supreme Court came to a similar conclusion, holding that the release in question was ineffective "because a parent cannot release the child's action." *Childress*, 777 S.W.2d at 7 (citing *Doyle v. Bowdoin College*, 403 A.2d 1206, 1208 n.3 (Me. 1979)).

---

proposition of law. *See Taylor v. Walker*, 48 Tenn. 734, 378 (Tenn. 1870) ("It is a settled law of this State, that a sale without service of process on an infant who has no regular guardian, is void, and that the want of such service can not [sic] be waived by the appearance of a guardian ad litem."); *Robertson v. Robertson*, 32 Tenn. 197, 199 (Tenn. 1852) ("'A guardian ad litem cannot, by his consent, make his ward a party to a suit.' The infant must be served with process."); *Wheatley's Lessee v. Harvey*, 31 Tenn. 484, 485 (Tenn. 1852) (holding that "the guardian ad litem had no authority to waive the service of process, without which the infant was no party to the suit").

The ***Childress*** Court, however, did not rely solely on the law from other jurisdictions. It also noted the conflict created by such agreements, as well as the fundamental public policy inherent in Tennessee law to protect the financial interests of minors. For example, this Court explained that agreements wherein a parent agrees to indemnify a third party for injuries to his or her child "are invalid as they place the interests of the child or incompetent against those of the parent or guardian." ***Childress***, 777 S.W.2d at 7 (citing ***Valdimer v. Mt. Vernon Hebrew Camps, Inc.***, 9 N.Y.2d 21, 210 N.Y.S.2d 520, 172 N.E.2d 283, 285 (1961)). In addition, the Court noted that refusing to enforce a waiver of the child's rights by the parent "is in keeping with the protection which Tennessee has afforded to the rights of infants and minors in other situations." ***Childress***, 777 S.W.2d at 7. The ***Childress*** Court noted that arguments to the contrary exist, specifically with regard to the chilling effect of its chosen rule, stating:

> We do not deny that there are good and logical reasons for giving effect to exculpatory and indemnification clauses executed by parents and guardians on behalf of infants and incompetents. Risk is inherent in many activities that make the lives of children richer. A world without risk would be an impoverished world indeed. As Helen Keller well said, "Security is mostly a superstition. It does not exist in nature, nor do the children of men as a whole experience it. Avoiding danger is no safer in the long run than outright exposure. Life is either a daring adventure or nothing." Partnow, *Quotable Woman*, 173 (1977). Ultimately, this case is a determination of who must bear the burden of the risk of injury to infants and minors.
>
> It is not our intention, nor do we feel the result of this case will be, to put a chill on activities such as the Special Olympics. The law is clear that a guardian cannot on behalf of an infant or incompetent, exculpate or indemnify against liability those organizations which sponsor activities for children and the mentally disabled.

*Id.* at 7–8.

Ultimately, the Court of Appeals agreed with those courts that had held that a parent cannot release a child's claim against a third party. *See id.* at 7 ("We, therefore, hold that [the mother] could not execute a valid release or exculpatory clause as to the rights of her son against the Special Olympics or anyone else, and to the extent the parties to the release attempted and intended to do so, the release is void."). The Court likewise held that the indemnity language contained in the contract was invalid. *Id.* The ***Childress*** Court therefore adopted a rule wherein parents or guardians cannot sign indemnity agreements or liability waivers on behalf of minor children or the incompetent. Noting the impact that the rule would have on many organizations, however, this Court specifically invited either the Tennessee Supreme Court or the Tennessee General Assembly to "remedy" this situation if either believed that Tennessee law should be

- 13 -

otherwise. *Id.* at 8 ("If this rule of law is other than as it should be, we feel the remedy is with the Supreme Court or the legislature.").

An application for permission to appeal to the Tennessee Supreme Court was eventually filed in *Childress*. The application was denied, however, by order of August 7, 1989. The issue was raised again in the Court of Appeals in 1990 by the case of *Rogers v. Donelson-Hermitage Chamber of Commerce*, 807 S.W.2d 242 (Tenn. Ct. App. 1990), *perm. app. denied* (Tenn. 1991), wherein this Court again held that the parent's purported release of the child's cause of action was unenforceable, even in the context of a wrongful death action. *Id.* at 246–47. Again, an application for permission to appeal to the Tennessee Supreme Court was filed and rejected by order of March 11, 1991. In addition, no legislative action has been taken to alter the rule established in *Childress* over twenty-five years ago.

**B.**

Sky High does not argue that *Childress* is not controlling or that it was wrongly decided in 1989. *See* Tenn. R. Sup. Ct. 4(G)(2) ("Opinions reported in the official reporter . . . shall be considered controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction."). As such, there is no dispute that if the *Childress* rule remains the law in Tennessee, Son's cause of action is not barred by the waiver and indemnity language contained in the release signed by Mother. Instead, Sky High asserts that this Court should revisit the rule set forth in *Childress* because changes in constitutional law concerning parental rights following the Tennessee Supreme Court's decision in *Hawk v. Hawk*, 855 S.W.2d 573 (Tenn. 1993), and the United States Supreme Court's decision in *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), have resulted in a "strong shift" in the law in this area across the country. Accordingly, we begin with a brief discussion of the *Hawk* decision.

In *Hawk*, paternal grandparents sought court-ordered visitation with their grandchildren pursuant to the Grandparents' Visitation Act located in Tennessee Code Annotated section 36-6-301 (1985). *Hawk*, 855 S.W.2d at 575. The facts showed that grandparents and the children's married parents had an acrimonious relationship and that, eventually, grandparents had been denied any visitation with the children. *Id.* Under the version of Section 36-6-301 then in existence, a court could order "'reasonable visitation' with grandparents if it is 'in the best interests of the minor child.'" *Id.* at 576 (quoting Tenn. Code Ann. § 36-6-301). Although the trial court declined to find that parents were unfit, it nevertheless ordered substantial visitation between grandparents and the children. *Id.* at 577. The trial court also noted that the grandparents "don't have to answer to anybody when they have the children." *Id.*

The Court of Appeals affirmed the judgment of the trial court, and the Tennessee Supreme Court eventually granted the parents' application for permission to appeal. *Id.* at

573, 577. The Tennessee Supreme Court first characterized the trial court's ruling as "a virtually unprecedented intrusion into a protected sphere of family life." *Id.* at 577. Because Section 36-6-301 "suggest[ed] that this level of interference is permissible," the Tennessee Supreme Court determined that it was necessary to examine the constitutionality of the statute "as it applies to married parents whose fitness as parents is unchallenged." *Id.*

Ultimately, the Tennessee Supreme Court held that the trial court's and Section 36-6-301's intrusion into parental decisions was unconstitutional because it interfered with the fundamental liberty interest allowing parents the "right to rear one's children." *Id.* at 578 (citing *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625, 626, 67 L. Ed. 1042 (1923)). According to the Tennessee Supreme Court, this right stemmed from the United States Supreme Court's "larger concern with privacy rights for the family." *Id.* at 578 (citing *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 442, 88 L. Ed. 645 (1944)). As such, the Tennessee Supreme Court concluded that the right to privacy inherent in both the United States and Tennessee Constitutions "fully protects the right of parents to care for their children without unwarranted state intervention." *Id.* at 579.

The grandparents in *Hawk* asserted, however, that grandparent visitation was "a 'compelling state interest' that warrants use of the state's *parens patriae* power to impose visitation in [the] 'best interests of the children.'" *Id.* (footnote omitted). The Tennessee Supreme Court rejected this argument, however, holding that "without a substantial danger of harm to the child, a court may not constitutionally impose its own subjective notions of the 'best interests of the child' when an intact, nuclear family with fit, married parents is involved." *Id.* In reaching this decision, the *Hawk* Court noted that "[i]mplicit in Tennessee case and statutory law has always been the insistence that a child's welfare must be threatened before the state may intervene in parental decision-making." *Id.* at 580 (citing Tenn. Code Ann. § 36-6-101 (allowing court intervention into custody matters in cases of divorce); Tenn. Code Ann. §37-1-113 & -114 (allowing court intervention into custody matters in dependency and neglect)). The Court also noted that its ruling was in line with federal decisions "requir[ing] that some harm threaten a child's welfare before the state may constitutionally interfere with a parent's right to rear his or her child." *Hawk*, 855 S.W.2d at 580 (citing *Wisconsin v. Yoder*, 406 U.S. 205, 230, 92 S. Ct. 1526, 1540, 32 L. Ed. 2d 15 (1972) (noting that the children at issue would not be harmed by receiving an Amish education); *Pierce v. Society of Sisters*, 268 U.S. 510, 534, 45 S. Ct. 571, 573, 69 L. Ed. 1070 (1925) (noting that the parents' choice of private school was "not inherently harmful"); *Meyer v. Nebraska*, 262 U.S. 390, 402–03, 43 S.Ct. 625, 628, 67 L. Ed. 1042 (1923) (opining that "proficiency in a foreign language . . . is not injurious to the health, morals or understanding of the ordinary child")). As the Tennessee Supreme Court explained: "The requirement of harm is the sole protection that parents have against pervasive state interference in the parenting process." *Hawk*, 855 S.W.2d at 581. As such, the *Hawk* Court held that "neither the legislature nor a court may properly intervene in parenting decisions absent significant harm to the child from those

- 15 -

decisions." *Id.* The trial court's award of grandparent visitation absent a showing of harm was therefore deemed unconstitutional. *Id*. Only a year later, the Tennessee Supreme Court extended the holding in *Hawk* to be applicable to all fit parents, not merely those part of "an intact, nuclear family[.]" *Nale v. Robertson*, 871 S.W.2d 674, 678 & 680 (Tenn. 1994).

A similar situation was at issue in the United States Supreme Court's decision in *Troxel v. Granville*. In *Troxel*, the paternal grandparents of two non-marital children filed a petition for grandparent visitation against the children's mother. *Troxel*, 530 U.S. at 61. Under the Washington statute applicable at that time, any person could petition the court for visitation with a child at any time so long as the child's best interests would be served by the visitation. *Id.* at 60. The trial court eventually entered an order allowing visitation. *Id.* at 61. The Washington Court of Appeals reversed the trial court's order, holding that the paternal grandparents lacked standing to seek visitation under the statute where no custody proceeding was pending. *Id.* at 62. In the meantime, the mother remarried, and her new husband adopted the children. Eventually, the Washington Supreme Court reversed the Washington Court of Appeals on the issue of standing, holding that the statute at issue allowed a visitation petition at any time. The Washington Supreme Court concluded, however, that the trial court nevertheless erred in ordering visitation under the statute, holding that the statute infringed on the fundamental right of parents to rear their children. *Id.* at 63. The United States Supreme Court eventually granted a writ of certiorari on the constitutional issue. *Id.*

The United States Supreme Court first recognized that "the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Id.* at 65. Citing decades of United States Supreme Court precedent, similar to the Tennessee Supreme Court in *Hawk*, the Court opined that "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id.* at 66. The *Troxel* Court therefore held that the Washington statute, as applied to the facts of the case, "unconstitutionally infringes on [] fundamental parental right[s]." *Id.* at 67. The Court noted that the statute essentially permitted judges, based solely on their personal evaluation of the child's best interests, to "disregard and overturn any decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition[.]" *Id.* The Court noted that none of the courts below had ever found the parents to be unfit, an important omission, as "there is a presumption that fit parents act in the best interests of their children." *Id.* at 68. As such, "so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id.* at 68–69. Because the trial court failed to honor this presumption, failed to give any weight to the preferences of the parents, and also failed to consider whether the parents had even denied visitation, the

*Troxel* Court held that the visitation award was unconstitutional in that case. *Id.* at 72. The United States Supreme Court declined, however, to rule on "whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation." *Id.* at 73. Accordingly, the Court did not "define . . . the precise scope of the parental due process right in the visitation context." *Id.*

## C.

Although this case does not involve grandparent visitation, Sky High argues that the *Hawk* Court's rejection of the state's *parens patriae* power to interfere in a parenting decision is also applicable to Mother's decision to waive Son's claims against Sky High. Because the *Hawk* holding has never been applied in the context of an exculpatory clause, Sky High cites several decisions relying on the recognition of fundamental parental rights in upholding liability waivers signed by parents on behalf of children. Indeed, Sky Hall asserts that in the wake of the *Troxel* decision, the law has seen a "strong shift" in favor of enforceability.

Sky High heavily relies on the Ohio Supreme Court's decision in *Zivich v. Mentor Soccer Club, Inc.*, 696 N.E.2d 201 (Ohio 1998). In *Zivich*, the child was injured while participating in a non-profit soccer club. *Id.* at 202. Prior to the child's participation, his mother signed a registration form for the activity, which contained a waiver of liability against the soccer club on behalf of the child. *Id.* When the parents sued the soccer club for the child's injuries, the soccer club responded that the claim was barred by the waiver. The trial court agreed with the soccer club and granted summary judgment in its favor. *Id.* The Court of Appeals affirmed the dismissal but held that the child's cause of action, once he reached the age of majority, had not been waived. *See Zivich v. Mentor Soccer Club, Inc.*, No. 95-L-184, 1997 WL 203646, at *1 (Ohio Ct. App. Apr. 18, 1997), *aff'd on other grounds*, 696 N.E.2d 201 (hereinafter, "Court of Appeals's *Zivich*"). *Id.* One Judge concurred in the result only, opining that that Ohio public policy favored enforcement of the exculpatory agreement against both parents and the child. Court of Appeals's *Zivich*, 1997 WL 203646, at *23 (Ford, J., concurring in result only).

The Ohio Supreme Court likewise affirmed the trial court's decision that the claims of both the parents and the child were barred by the exculpatory clause contained in the registration form. *Zivich*, 696 N.E.2d at 207. In reaching this result, the Ohio Supreme Court first rejected the parents' argument that the agreement should not be enforced on public policy grounds, given that contracts entered into by minors were generally unenforceable in Ohio. *Id.* at 204. Rather, the Ohio Supreme Court held that Ohio public policy actually favored enforcement of the agreement, citing Ohio statutes enacted to "encourage landowners to open their land to public use for recreational activities without fear of liability." *Id.* at 204–05 (citing Ohio Rev. Code Ann. §§ 1533.18 & 1533.181). Indeed, the Ohio Supreme Court noted that, although the statute

was not applicable to the case-at-bar, the Ohio General Assembly had recently enacted statutes that "accord qualified immunity to unpaid athletic coaches and sponsors of athletic events." *Id.* at 205 (citing Ohio Rev. Code Ann. §§ 2305.381 & 2305.3825). The *Zivich* Court also noted the inherent benefits in allowing children to participate in sporting activities:

> Organized recreational activities offer children the opportunity to learn valuable life skills. It is here that many children learn how to work as a team and how to operate within an organizational structure. Children also are given the chance to exercise and develop coordination skills. Due in great part to the assistance of volunteers, nonprofit organizations are able to offer these activities at minimal cost. . . . Clearly, without the work of its volunteers, these nonprofit organizations could not exist, and scores of children would be without the benefit and enjoyment of organized sports. Yet the threat of liability strongly deters many individuals from volunteering for nonprofit organizations. *Developments in the Law— Nonprofit Corporations—Special Treatment and Tort Law* (1992), 105 Harv. L. Rev. 1667, 1682. Insurance for the organizations is not the answer, because individual volunteers may still find themselves potentially liable when an injury occurs. Markoff, *Liability Threat Looms: A Volunteer's Thankless Task* (Sept. 19, 1988), 11 Natl. L.J. 1, 40. Thus, although volunteers offer their services without receiving any financial return, they place their personal assets at risk.

*Id.* Given these risks, the Ohio Supreme Court noted that these organizations "could very well decide that the risks are not worth the effort," which would reduce the number of low-cost sporting activities available to the youth. *Id.*


In addition to the Ohio public policy favoring low-cost youth sporting activities, the *Zivich* Court noted that its decision aligned with "the importance of parental authority." *Id.* (citing Court of Appeals's *Zivich*, 1997 WL 203646, at \*23 (Ford, J., concurring in result only)) (agreeing with the reasoning espoused by Judge Ford in his concurrence to the Court of Appeals's *Zivich*). As the *Zivich* Court explained, parents have a right to raise their children, a fundamental liberty interest in the "the care, custody, and management of their offspring[,]" and "a fundamental, privacy-oriented right of personal choice in family matters," all of which are protected by due process. *Id.* at 206 (citing Court of Appeals's *Zivich*, 1997 WL 203646, at \*24 (Ford, J., concurring in result only)). In addition, the Ohio Supreme Court provided examples where Ohio statutory law empowers parents to make decisions for their children, including the right to consent or decline medical treatment. *Id.* (citing Ohio Rev. Code Ann. § 2317.54[C]; *Lacey v. Laird*, 166 Ohio St. 12, 19, 1 O.O.2d 158, 161, 139 N.E.2d 25, 30 (Ohio 1956) (Hart, J., concurring)). Thus, the *Zivich* Court concluded that invalidating the release would be

"inconsistent with conferring other powers on parents to make important life choices for their children." *Id.* at 206 (citing Court of Appeals's *Zivich*, 1997 WL 203646, at *25–26 (Ford, J., concurring in result only)). According to the Ohio Supreme Court, the decision to allow the child to participate in a potentially dangerous activity after having signed a liability waiver on behalf of the child is "an important family decision" in which a parent makes a decision regarding whether "the benefits to her child outweighed the risk of physical injury." *Id.* at 207. After concluding that this decision is protected by the fundamental right of parental authority, the Ohio Supreme Court ultimately held that the decision could not be "disturb[ed]" by the courts. *Id.* Accordingly, the *Zivich* Court ruled that the waiver was enforceable.

Sky High emphasizes that at least three other states have similarly held that pre-injury waivers of a minor's claims by parents were enforceable due to the court's inability to interfere with fit parents' decisions. *See Saccente v. LaFlamme*, No. CV0100756730, 2003 WL 21716586 (Conn. Super. Ct. July 11, 2003); *Sharon v. City of Newton*, 769 N.E.2d 738 (Mass. 2002); *BJ's Wholesale Club, Inc. v. Rosen*, 80 A.3d 345 (Md. 2013). First, in *Saccente v. LaFlamme*, the child's father signed an indemnity agreement on behalf of his daughter to participate in horseback riding lessons. *Saccente*, 2003 WL 21716586, at *1. When the child was injured and the mother sued on her behalf, the defendant farm raised the indemnity agreement as a defense. *Id.* The Superior Court of Connecticut ultimately held that the indemnity agreement signed by the child's parent was enforceable to bar the child's claim. *Id.* at 7.[4] In reaching this result, the *Saccente* Court relied, in part, on the fundamental parental rights recognized by the United States Supreme Court in *Troxel*. *Id.* at *6 (citing *Troxel*, 530 U.S. at 65). In the *Saccente* Court's view, a parent's right to make decisions regarding the rearing of children extends to "the right to control their associations," including the "[t]he decision here by her father to let the minor plaintiff waive her claims against the defendants in exchange for horseback riding lessons at their farm[.]" *Saccente*, 2003 WL 21716586, at *6–7 (distinguishing cases where releases have been held invalid by the fact that Connecticut statutory law did not forbid parents from settling the claims of their children).

In *Sharon v. City of Newtown*, a student sued the city for injuries she had incurred while participating in cheerleading practice at a public school. *Sharon*, 769 N.E.2d at 741. In rejecting the student's argument that a waiver signed by the student's father was invalid, the Massachusetts Supreme Judicial Court held that enforcing the waiver

---

[4] The Superior Court in *Saccente* comes to the opposite conclusion as the Superior Court previously came to in *Fedor v. Mauwehu Council, Boy Scouts of Am., Inc.*, 21 Conn. Supp. 38, 143 A.2d 466 (Conn. Super. Ct. 1958). The *Saccente* Court distinguished *Fedor* on the basis that parents there had "had no choice but to sign the waiver" in order to participate in a Boy Scout camp for low-income families. *Saccente*, 2003 WL 21716586, at *4. The *Saccente* Court concluded that the same was not true of the child's horseback riding lessons.

- 19 -

"comports with the fundamental liberty interest of parents in the rearing of their children, and is not inconsistent with the purpose behind our public policy permitting minors to void their contracts." *Id.* at 747. In addition, the **Sharon** Court noted that its decision was in line with Massachusetts statutes exempting certain nonprofit organizations, volunteer managers and coaches, and owners of land who permit the public to use their land for recreational purposes without imposing a fee from liability for negligence. *Id.* (noting that enforcement also comports with a policy of "encouragement of athletic activities for minors" and does not conflict with Massachusetts statutory law requiring court approval of minor settlements).

Likewise in **BJ's Wholesale Club, Inc. v. Rosen**, the defendant wholesale club sought to dismiss a negligence claim brought on behalf of a minor due to the fact that the parents had signed an exculpatory agreement on behalf of the child. **Rosen**, 80 A.3d at 346. The Maryland Court of Appeals, Maryland's high court, held that the exculpatory agreement was valid, rejecting the parents' argument that the agreement should be invalidated through the States' *parens patrie* authority. The **Rosen** Court noted, however, that such authority was only invoked where a parent is unfit or in the context of juvenile delinquency. *Id.* at 361. As the Maryland Court of Appeals explained: "We have, thus, *never* applied *parens patriae* to invalidate, undermine, or restrict a decision, such as the instant one, made by a parent on behalf of her child in the course of the parenting role." *Id.* at 362. Ultimately, the Maryland Court of Appeals upheld the validity of the agreement, relying also on Maryland statutes allowing parents to make financial, medical, mental health, and educational decisions for their children   *Id.* (citing Md. Code Ann., Cts. & Jud. Proc. § 6-405 (allowing parents to settle claims on behalf of minors without court approval);[5] Md. Code Ann., Educ. § 7-301 (allowing parents the choice to homeschool their children); Md. Code Ann., Health-Gen. § 10-610 (allowing a parent to commit a child to mental health services under limited circumstances); Md. Code Ann., Health-Gen. § 20-102 (giving parents the authority to consent to a minor's medical treatment)). At least one federal case interpreting state law has also enforced such an agreement. *See* **Kelly v. United States**, No. 7:10-CV-172-FL, 2014 WL 4793009, at *5 (E.D. N.C. Sept. 25, 2014) (holding that upholding releases signed by parents on behalf of children "serve[s] the public interest by respecting the realm of parental authority to weigh the risks and costs of physical injury to their children against the benefits of the child's participation in an activity").

In addition to these cases, it appears that other jurisdictions have likewise upheld similar exculpatory agreements signed on behalf of children without reliance on the fundamental parental rights doctrine. *See* **Hohe v. San Diego Unified Sch. Dist.**, 224 Cal.

---

[5] The **Rosen** Court found this statute particularly instructive, as other jurisdictions where exculpatory agreements signed by parents were unenforceable had often relied upon statutes that required court approval for parents to settle lawsuits on behalf of minors as next friend. **Rosen**, 80 A.3d at 356–57; *see also infra*, for additional discussion of this factor.

App. 3d 1559, 274 Cal. Rptr. 647 (Ct. App. 1990) (holding, with little analysis regarding the public policy in favor or against such a rule, that "[a] parent may contract on behalf of his or her children" even in the context of a release); ***Kondrad ex rel. McPhail v. Bismarck Park Dist.***, 2003 ND 4, ¶ 5, 655 N.W.2d 411, 413 (including no analysis as to the issue of whether a parent may waive claims on behalf of a minor); ***Osborn v. Cascade Mountain, Inc.***, 2003 WI App 1, ¶ 10, 259 Wis. 2d 481, 655 N.W.2d 546 (same). In still other states, court decisions refusing to enforce such agreements have been legislatively overturned. *See **Cooper v. Aspen Skiing Co.***, 48 P.3d 1229 (Colo. 2002), *superseded by* Colo. Rev. Stat. Ann. § 13-22-107 (declaring it the public policy of Colorado to permit "a parent of a child to release a prospective negligence claim of the child against" organizations that provide "sporting, recreational, educational, and other activities where certain risks may exist"); ***Kirton v. Fields***, 997 So. 2d 349, 358 (Fla. 2008), *somewhat superseded by* Fla. Stat. Ann. § 744.301 (permitting a parent to waive a child's future cause of action only as to the inherent risks of an activity against a "commercial activity provider," not claims resulting from the provider's own negligence). Sky High therefore argues that this Court should follow the "strong shift" in the law in favor of enforceability based upon Tennessee and federal constitutional law regarding the state's inability to interfere in the parenting decisions of fit parents.

That is not to say, however, that jurisdictions that enforce exculpatory agreements or liability waivers signed on behalf of children by their parents enjoy a distinct majority in the United States. Indeed, even as recently as 2010, one court characterized the state of the law as the opposite—that "a clear majority" of courts have held in favor of finding such agreements unenforceable. ***Galloway v. State***, 790 N.W.2d 252, 258 (Iowa 2010). Compared with the approximately nine jurisdictions wherein courts or legislatures have enforced such agreements, our research has revealed at least fourteen jurisdictions wherein courts have specifically held that exculpatory, release, or indemnification agreements signed by parents on behalf of children are unenforceable. *See **Chicago, R.I. & P. Ry. Co. v. Lee***, 92 F. 318, 321 (8th Cir. 1899); ***J.T. ex rel. Thode v. Monster Mountain, LLC***, 754 F. Supp. 2d 1323, 1328 (M.D. Ala. 2010) (applying Alabama law and "the weight of authority in other jurisdictions"); ***Fedor v. Mauwehu Council, Boy Scouts of Am., Inc.***, 21 Conn. Supp. 38, 143 A.2d 466 (Conn. Super. Ct. 1958); ***Meyer v. Naperville Manner***, Inc., 262 Ill. App. 3d 141, 145, 634 N.E.2d 411, 413 (Ill. 1994); ***Galloway v. State***, 790 N.W.2d 252, 258 (Iowa 2010); ***Doyle v. Bowdoin College***, 403 A.2d 1206, 1208 n.3 (Me. 1979); ***Woodman ex rel. Woodman v. Kera LLC***, 486 Mich. 228, 785 N.W.2d 1 (Mich. 2010); ***Khoury v. Saik***, 203 Miss. 155, 33 So. 2d 616, 618 (1948) (reaffirmed in ***Burt v. Burt***, 841 So. 2d 108 (Miss. 2001)); ***Fitzgerald v. Newark Morning Ledger Co.***, 111 N.J. Super. 104, 108, 267 A.2d 557, 559 (N.J. Law. Div. 1970); ***Valdimer v. Mount Vernon Hebrew Camps, Inc.***, 9 N.Y.2d 21, 24, 172 N.E.2d 283, 285 (N.Y. 1961); ***Ohio Cas. Ins. Co. v. Mallison***, 223 Or. 406, 412, 354 P.2d 800, 803 (Or. 1960); ***Shaner v. State Sys. of Higher Educ.***, 40 Pa. D. & C.4th 308, 313 (Com. Pl. 1998), *aff'd without opinion*, 738 A.2d 535 (Pa. Commw. Ct. 1999); ***Hawkins ex rel. Hawkins v. Peart***, 2001 UT 94, 37 P.3d 1062, *somewhat superseded by* Utah Code Ann.

§ 78B-4-203 (allowing a release against an "equine or livestock activity sponsor");[6] ***Munoz v. II Jaz Inc.***, 863 S.W.2d 207, 210 (Tex. App. 1993); ***Scott By & Through Scott v. Pac. W. Mountain Resort***, 119 Wash. 2d 484, 494, 834 P.2d 6, 11 (Wash. 1992).

A few courts refusing to enforce these agreements have expressly considered, and rejected, similar arguments contending that enforcement is necessary to comport with a parent's fundamental right to control his or her children. For example, the court in ***Woodman ex rel. Woodman v. Kera LLC*** rejected this argument on the ground that under such an analysis "a parent would be able to bind the child in any contract, no matter how detrimental to the child," including contracts where the law is well-settled that parents may not consent on behalf of their children. ***Woodman***, 785 N.W.2d at 8 (quoting ***McKinstry v. Valley Obstetrics-Gynecology Clinic, P.C.***, 428 Mich. 167, 405 N.W.2d 88 (1987) (noting the general rule that "a parent has no authority to waive, release, or compromise claims by or against a child"). Rather, the ***Woodman*** Court noted that if such a massive shift in the law was warranted, the change should originate in the legislature, rather than the courts. ***Id.*** at 9–10.

The Iowa Supreme Court likewise considered an argument that the enforcement of pre-injury releases was in line with the "public policy giving deference to parents' decisions affecting the control of their children and their children's affairs." ***Galloway***, 790 N.W.2d at 256. The ***Galloway*** Court recognized that parents have a fundamental liberty interest "in the care, custody, and control of [their] children[.]" ***Id.*** (quoting ***Lamberts v. Lillig***, 670 N.W.2d 129, 132 (Iowa 2003)). The Court noted, however, that this interest was "restricted to some extent by the public's interest in the best interests of children." ***Id.*** In support, the Court cited Iowa law preventing parents from waiving child support payments, preventing parents from receiving payments on behalf of a child of more than $25,000.00, and preventing conservators from compromising a child's cause of action absent court approval. ***Id.*** at 256–57 (citing Iowa Code § 598.21C(3) (stating that any modification to child support is void unless approved by the court); Iowa Code § 633.574 (limiting a parent's ability to receive property on behalf of child to an aggregate value of $25,000.00); Iowa Code § 633.647(5) (requiring a child's conservator to obtain court approval for the settlement of the child's claim)). The Court further rejected the defendants' claim that "recreational, cultural, and educational opportunities for youths will cease because organizations sponsoring them will be unable or unwilling to purchase insurance or otherwise endure the risks of civil liability," finding such fear "speculative and overstated." ***Id.*** at 258–59. The ***Galloway*** Court therefore held that inherent in Iowa law was "a well-established public policy that children must be accorded a measure of protection against improvident decisions of their parents." ***Id.*** at 256. The Iowa Supreme Court therefore held that public policy prevented enforcement of the pre-injury release

---

[6] The Utah Supreme Court has recently announced that ***Hawkins*** remains valid law as to whether public policy invalidates an exculpatory agreement "in the absence of statutory language." *See **Penunuri v. Sundance Partners**, Ltd.*, 2013 UT 22, ¶ 28, 301 P.3d 984, 992

signed by a student's mother regarding injuries the child sustained while on an educational field trip organized by a state university. *Id.* at 253.

Although the holding was later superseded by statute, the reasoning of the Colorado Supreme Court on this issue is also illuminating. *Cooper v. Aspen Skiing Co.* involved a child injured in a skiing accident whose mother had signed a pre-injury release on his behalf. *Cooper*, 48 P.3d at 1230. In invalidating the release, the Colorado Supreme Court specifically held that a parent's fundamental right to "the care, custody, and control of their children" did not extend to a parent's decision to disclaim a minor's potential future recovery for injuries caused by the negligence of a third party. *Id.* at 1235 n.11 (quoting *Troxel*, 530 U.S. at 65). As the *Cooper* Court explained:

> A parental release of liability on behalf of his child is not a decision that implicates such fundamental parental rights as the right to "establish a home and bring up children," *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L. Ed. 1042 (1923), and the right "to direct the upbringing and education of children under their control," *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35, 45 S. Ct. 571, 69 L. Ed. 1070 (1925). Moreover, it does not implicate a parent's "traditional interest . . . with respect to the religious upbringing of their children," *Wisconsin v. Yoder*, 406 U.S. 205, 214, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972), or such medical decisions as a parent's right to "retain a substantial . . . role" in the decision to voluntary commit his child to a mental institution (with the caveat that the child's rights and the physician's independent judgment also plays a role), *Parham v. J.R.*, 442 U.S. 584, 604, 99 S. Ct. 2493, 61 L. Ed. 2d 101 (1979); rather a parental release on behalf of a child effectively eliminates a child's legal right to sue an allegedly negligent party for torts committed against him. It is, thus, not of the same character and quality as those rights recognized as implicating a parents' fundamental liberty interest in the "care, custody, and control" of their children.
>
> Furthermore, even assuming arguendo, that a parental release on behalf of a minor child implicates a parent's fundamental right to the care, custody, and control of his child, this right is not absolute. *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944); *People v. Shepard*, 983 P.2d 1, 4 (Colo. 1999). Indeed, "[a]cting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor and in many other ways." *Prince v. Massachusetts*, 321 U.S. [at] 166 . . .

(footnotes omitted). In fact, "in order to protect a child's well-being, the state may restrict parental control." *Shepard*, 983 P.2d at 4.

*Cooper*, 48 P.3d at 1235 n.11.

Appellants argue that this Court should likewise reject any argument that the enforcement of liability waivers against minors is required by the fundamental parental rights doctrine. Based upon this split of authority, we must determine whether Tennessee public policy favors a change in the rule established by this Court in *Childress*.

**D.**

"'[T]he public policy of Tennessee is to be found in its constitution, statutes, judicial decisions and applicable rules of common law.'" *In re Baby*, 447 S.W.3d 807, 823 (Tenn. 2014) (quoting *Cary v. Cary*, 937 S.W.2d 777, 781 (Tenn.1996)). "Primarily, it is for the legislature to determine the public policy of the state, and if there is a statute that addresses the subject in question, the policy reflected therein must prevail." *Hyde v. Hyde*, 562 S.W.2d 194, 196 (Tenn. 1978) (citing *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290, 17 S. Ct. 540, 41 L. Ed. 1007 (1897)). In order to determine whether a contract "is inconsistent with public policy, courts may consider the purpose of the contract, whether any violation is inherent in the contract itself, as opposed to merely a collateral consequence, and, finally, whether the enforcement of the contract will have a detrimental effect on the public." *Baby*, 447 S.W.3d at 823 (citing *Baugh v. Novak*, 340 S.W.3d 372, 382 (Tenn. 2011)). "'The principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which that doctrine rests.'" *Home Beneficial Ass'n v. White*, 180 Tenn. 585, 589, 177 S.W.2d 545, 546 (1944) (quoting *Twin City Pipe Line Co. v. Harding Glass Co.*, 283 U.S. 353, 356–57, 51 S. Ct. 476, 477, 75 L. Ed. 1112 (1931)).

Here, there can be no doubt that the Tennessee public policy, as evidenced by the Tennessee Supreme Court's decision in *Hawk*, does not favor intervention in the parental decisions of fit parents. *See Hawk*, 855 S.W.2d at 579. As such, where a fit parent makes a parental decision, our courts generally will not interfere. *Id.* Courts in Tennessee have cited *Hawk* to protect a parent's right most often in the context of dependency and neglect proceedings, termination of parental rights proceedings, parentage actions, child custody proceedings, and grandparent visitation proceedings. *See, e.g.*, *In re Carrington H.*, 483 S.W.3d 507 (Tenn.), *cert. denied sub nom. Vanessa G. v. Tenn. Dep't of Children's Servs.*, 137 S. Ct. 44, 196 L. Ed. 2d 28 (2016) (involving termination of parental rights); *Lovlace v. Copley*, 418 S.W.3d 1, 26 (Tenn. 2013) (involving grandparent visitation); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007) (involving termination of parental rights); *In re Adoption of Female Child*, 896 S.W.2d 546, 548 (Tenn. 1995) (involving custody of a child); *Broadwell by Broadwell v. Holmes*, 871 S.W.2d 471, 476–77 (Tenn. 1994) (limiting parental immunity only "to conduct that constitutes the exercise of parental authority, the performance of parental

supervision, and the provision of parental care and custody"); ***McGarity v. Jerrolds***, 429 S.W.3d 562 (Tenn. Ct. App. 2013) (involving grandparent visitation); ***State v. Cox***, No. M1999-01598-COA-R3-CV, 2001 WL 799732, at *10 (Tenn. Ct. App. July 17, 2001) (involving dependency and neglect); ***Matter of Hood***, 930 S.W.2d 575, 578 (Tenn. Ct. App. 1996) (involving a parentage action). In one case, ***Hawk*** was cited as support for a parent's right to control a child's access to the telephone and to "consent . . . vicariously to intercepting, recording and disclosing the child's conversation with [f]ather." ***Lawrence v. Lawrence***, 360 S.W.3d 416, 421 (Tenn. Ct. App. 2010). In another case, however, this Court held that a parent's fundamental right to rear his or her children was not violated by a Tennessee law allowing physicians to prescribe contraceptives to minors without parental authorization. *See* ***Decker v. Carroll Acad.***, No. 02A01-9709-CV-00242, 1999 WL 332705, at *13 (Tenn. Ct. App. May 26, 1999).

Additionally, this policy of protecting fundamental parental rights is often reflected in our statutory law. For example, Tennessee Code Annotated section 34-1-102 provides that parents are equally charged with the "care, management and expenditure of [their children's] estates." Another statute, Tennessee Code Annotated section 37-1-140, states in relevant part:

> A custodian to whom legal custody has been given by the court under this part has the right to the physical custody of the child, the right to determine the nature of the care and treatment of the child, including ordinary medical care and the right and duty to provide for the care, protection, training and education, and the physical, mental and moral welfare of the child, subject to the conditions and limitations of the order and to the remaining rights and duties of the child's parents or guardian.

Tenn. Code Ann. § 37-1-140(a).[7] Other statutes littered throughout the Tennessee Code also reflect this policy. *See, e.g.*, Tenn. Code Ann. § 33-8-303 (giving a parent authority

---

[7] We note that this Court recently held that under the specific language of the trust agreement at issue, it was "without question the trustee has the right under the Trust Agreement to agree to arbitration binding the Minor beneficiary as to claims or demands once they have arisen." ***Gladden v. Cumberland Trust & Inv. Co.***, No. E2015-00941-COA-R9-CV, 2016 WL 1166341, at *5 (Tenn. Ct. App. Mar. 24, 2016), *perm. app.granted* (Aug. 18, 2016). The Court held however that the trustee had no power to agree to arbitration of unknown future claims. *Id.* at *6. The situation is distinguishable from this cause for three reasons: (1) the case involved a question of a trustee's authority under a specific trust agreement, rather than a question of a parent's authority based upon the Tennessee and federal constitutions; (2) the Court held that the language of the agreement, rather than public policy considerations, required it to hold that the trustee had no power to agree to arbitrate unknown disputes; (3) the agreement at issue was an agreement to arbitrate, which limits only the forum in which a claim may be raised, rather than limiting liability. *See* ***Buraczynski v. Eyring***, 919 S.W.2d 314, 319 (Tenn. 1996) (holding that arbitration agreements "do not limit liability, but instead designate a forum that is alternative to and independent of the judicial forum"). As such, the ***Gladden*** Opinion is inapposite to the issues raised in this case. Furthermore, because the Tennessee Supreme Court recently granted permission for appeal of the

to submit minor child to convulsive therapy, but only if neither the child nor the child's other parent object to the treatment); Tenn. Code Ann. § 36-3-106 (giving a parent authority to consent to a minor's marriage); Tenn. Code Ann. § 47-25-1105 (giving parents the authority to solicit minor child's name, photograph, or likeness); Tenn. Code Ann. § 49-2-124 (giving a parent authority to submit their minor child to involuntary mental health or socioemotional screening); Tenn. Code Ann. § 50-5-105 (giving parents the authority to consent to the employment of their minor children aged sixteen or seventeen with certain restrictions set by the state); Tenn. Code Ann. § 62-38-305 (giving a parent the authority to consent to a minor's body piercing, given certain limitations); Tenn. Code Ann. § 68-1-118 (allowing parents to consent to the release of protected health information of their minor children); Tenn. Code Ann. § 68-117-104 (allowing parents to consent to minor's use of tanning devices).

The fundamental parental rights doctrine, however, is not absolute. *See* **Prince**, 321 U.S. at 166 ("Acting to guard the general interest in youth's well[-]being, the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways.") (footnotes omitted). Indeed, as recently as 2011, the Tennessee Supreme Court recognized the courts' power to invalidate certain contracts made by parents on behalf of minors. *See* **Wright ex rel. Wright v. Wright**, 337 S.W.3d 166 (Tenn. 2011). In **Wright**, a minor was seriously injured in an automobile accident, and her father retained the services of an attorney to represent him and the child in a lawsuit to recover for her injuries. **Id.** at 170. In connection with the representation, the father signed a one-third contingency fee with the attorney. The agreement noted, however, that fees on behalf of the minor would require court approval. The father thereafter filed a complaint on behalf of the child as next friend. Because the child's parents were divorced, the trial court eventually appointed a guardian ad litem for the child. Ultimately, the parties agreed to settle the case for $425,000 on behalf of the child, as well as courts costs, guardian ad litem fees, and other expenses. The document evincing the agreement also indicated that the parties agreed to the "contractual attorney's fees." **Id.** at 171.

A dispute soon arose between the guardian ad litem and the retained attorney over the amount of attorney's fees owed to the attorney; while the retained attorney contended he was entitled to one-third of the settlement amount, the guardian ad litem asserted that the retained attorney was only entitled to a reasonable fee as set by the court. **Id.** The trial court eventually entered an order awarding the retained attorney his full fee under the contingency contract. **Id.** at 172. The Court of Appeals reversed and remanded for a recalculation of the fees. **Id.** The trial court held a hearing and ultimately awarded $131,000.00 in attorney's fees. **Id.** at 175 (citing **Wright v. Wright**, No. M2007-00378-COA-R3-CV, 2007 WL 4340871, at *1 (Tenn. Ct. App. Dec. 12, 2007) (hereinafter,

**Gladden** case, we await final resolution of the issues decided therein.

"***Wright I***")). After the fee was affirmed by the Court of Appeals, the Tennessee Supreme Court granted the guardian ad litem's application for permission to appeal. ***Id.*** at 176.

As is relevant to this case, the Tennessee Supreme Court first reaffirmed "the long-standing" principle in Tennessee that "a next friend representing a minor cannot contract with an attorney for the amount of the attorney's fee so as to bind the minor[.]" ***Id.*** at 179 (citing ***City of Nashville v. Williams***, 169 Tenn. 38, 82 S.W.2d 541, 541 (1935)). In reaching this decision, the ***Wright*** Court noted two statutes allowing Tennessee courts the power to approve settlements made on behalf of minors. ***Wright***, 337 S.W.3d at 178. First, Tennessee Code Annotated section 34-1-121 provides, in pertinent part:

> In any action, claim, or suit in which a minor or person with a disability is a party or in any case of personal injury to a minor or person with a disability caused by the alleged wrongful act of another, the court in which the action, claim, or suit is pending, or the court supervising the fiduciary relationship if a fiduciary has been appointed, has the power to approve and confirm a compromise of the matters in controversy on behalf of the minor or person with a disability. If the court deems the compromise to be in the best interest of the minor or person with a disability, any order or decree approving and confirming the compromise shall be binding on the minor or person with a disability.

Tenn. Code Ann. § 34-1-121(b); *see also* ***Vannucci v. Memphis Obstetrics & Gynecological Ass'n, P.C.***, No. W2005-00725-COA-R3-CV, 2006 WL 1896379, at *11 (Tenn. Ct. App. July 11, 2006) (holding that where a settlement involves a minor, section 34-1-121 "requir[es]" that the trial court "go beyond its normal role" and approve or disapprove of the proposed settlement). Likewise, Section 29-34-105 requires an in-chambers hearing attended by both the minor and his or her guardian in order to approve a settlement totaling more than $10,000.00. From these statutes, the Tennessee Supreme Court concluded that Tennessee public policy allows courts to "assume a special responsibility to protect a minor's interests." ***Wright***, 337 S.W.3d at 178. The ***Wright*** Court therefore affirmed the ruling that the retained attorney was not entitled to the contractual fee, but merely to a reasonable fee as set by the court. ***Id.*** Ultimately, the Tennessee Supreme Court affirmed the trial court's award of $131,000.00 in attorney's fees. ***Id.*** at 188.

From ***Wright***, we can glean that Tennessee's public policy includes a well-settled principle requiring courts to act as *parens patriae* to protect a child's financial interests. Indeed, Tennessee statutory law, the most salient source of Tennessee public policy, includes several statutes that offer protections for a minor's financial interests, even if that protection interferes with a parent's decisions. *See* Tenn. Code Ann. § 29-34-105 (requiring court approval of settlements on behalf of minors of more than $10,000.00);

Tenn. Code Ann. § 34-1-102(a) (limiting a parent's use of child's income to only "so much . . . as may be necessary . . . (without the necessity of court authorization) for the child's care, maintenance and education"); Tenn. Code Ann. § 34-1-121(b) (giving the court power to approve settlements on behalf of minors where the settlement is in the minor's best interest); Tenn. Code Ann. § 34-1-122 (authorizing the court to approve or disapprove of "expenditures of income or principal of the property of the minor or person with a disability" and providing limits on the type of "gift program[s]" that may be approved). The Tennessee Supreme Court previously characterized these statutes as "plac[ing] the responsibility and burden upon the court to act for the minor." ***Busby v. Massey***, 686 S.W.2d 60, 63 (Tenn. 1984). When these statutes are implicated, "the trial court is not bound by desires, interests or recommendations of attorneys, parents, guardians or others." ***Id.*** (citing ***Rafferty v. Rainey***, 292 F. Supp. 152 (E.D. Tenn. 1968)); *see also* ***Wright I***, 2007 WL 4340871, at \*1 ("By caselaw and by statute the settlement of a case brought by a minor for personal injuries **must** be approved by the court, and the court must ensure that the settlement itself is in the best interests of the minor.") (emphasis added).

In addition to statutes on this subject, Tennessee caselaw provides another significant protection for the financial interests of a minor even against his or her parent: a parent may not, by agreement, waive the child's right to support from the other parent. ***Huntley v. Huntley***, 61 S.W.3d 329, 336 (Tenn. Ct. App. 2001) (citing ***Norton v. Norton***, No. W1999-02176-COA-R3-CV, 2000 WL 52819, at \*4 (Tenn. Ct. App. Jan.10, 2000)). As this Court explained: "It is against public policy to allow the custodial parent to waive the child's right to support[,]" as the child is the beneficiary of the support, not the parent. ***A.B.C. v. A.H.***, No. E2004-00916-COA-R3-CV, 2005 WL 74106, at \*7 (Tenn. Ct. App. Jan. 13, 2005) (citing ***Pera v. Peterson***, 1990 WL 200582 (Tenn. Ct. App. Dec. 14, 1990)); *see also* ***Berryhill v. Rhodes***, 21 S.W.3d 188, 192, 194 (Tenn. 2000) (holding that private agreements to circumvent child support obligations are against public policy). Such agreements are therefore "void as against public policy as established by the General Assembly." ***Witt v. Witt***, 929 S.W.2d 360, 363 (Tenn. Ct. App. 1996); *see also* ***Galloway***, 790 N.W.2d at 256–57 (relying on Iowa law preventing parents from entering into agreements waiving child support as a reason for its rule invalidating waivers of liability signed by parents on behalf of minors). The Tennessee Supreme Court has likewise held that parents engaged in a child custody dispute "cannot bind the court with an agreement affecting the best interest of their children." ***Tuetken v. Tuetken***, 320 S.W.3d 262, 272 (Tenn. 2010). Finally, we note that Rule 17.03 of the Tennessee Rules of Civil Procedure allows a court to appoint a guardian ad litem for a child "at any time after the filing of the complaint" in two instances: (1) when the child has no duly appointed representative; or (2) when "justice requires" the appointment. Thus, Rule 17.03 allows the appointment of a guardian ad litem even when the child is represented by his or her parent in the capacity of next friend. *See* ***Gann v. Burton***, 511 S.W.2d 244, 246 (Tenn. 1974) (holding that the court's decision to appoint a guardian ad litem when "justice requires" is discretionary and is determined on a case-by-case basis).

Tennessee statutory law also contains other protections that arguably interfere with a parent's right to the custody and control of his or her children, albeit not in a financial context. *See* Tenn. Code Ann. § 34-6-307 (granting a parent the right to refuse medical treatment for his or her child, unless the parent's decision "jeopardize[s] the life, health, or safety of the minor child"); Tenn. Code Ann. § 37-10-303 (granting the parent the right to consent to his or her child's abortion, but providing that, in the absence of parental consent, consent may be obtained from the court); Tenn. Code Ann. §§ 37-10-401 to -403 (placing on the parent the duty to vaccinate a child, unless certain religious exceptions apply); Tenn. Code Ann. § 49-6-3001 (requiring parents to enroll their school-aged children in school, unless exempted); Tenn. Code Ann. § 49-6-3009 (making it a crime for a parent who has control of a child to allow the child to be truant from a remedial institution); Tenn. Code Ann. § 49-6-3050 (regulating home schooling); Term. Code Ann. § 68-34-107 (allowing a physician to provide a minor with contraceptive if the minor obtains parental consent **or** simply if the minor "requests and is in need of birth control procedures, supplies or information"). Indeed, one statute specifically invalidates a contract entered into by the biological and adoptive parents if the parties agree to visitation post-adoption. *See* Tenn. Code Ann. § 36-1-121(f) ("Any provision in an order of the court or in any written agreement or contract between the parent or guardian of the child and the adoptive parents requiring visitation or otherwise placing any conditions on the adoption shall be void and of no effect whatsoever[.]").

Because of the statutory and caselaw in Tennessee providing protection for a minor's financial and other interests, we first note that Tennessee law is clearly distinguishable from many of the cases in which enforcement of liability waivers was held to be appropriate. For example, the Connecticut Superior Court in *Saccente v. LaFlamme* specifically noted that its decision did not conflict with Connecticut public policy as evidenced by statutes because there was "no Connecticut law, and the [parties have] cited none, which affords such specific protections for minors." *Saccente*, 2003 WL 21716586, at *6–7 (citing Conn. Gen. Stat. Ann. § 45a-631 (allowing parents to settle the claims of their children if the amount recovered is less than $10,000.00)). Likewise in *BJ's Wholesale Club, Inc. v. Rosen*, the Maryland Court of Appeals noted that rather than having no statute prohibiting the practice of parental consent to minor settlements without court approval, such practice was actually authorized by Maryland statutory law. *See Rosen*, 80 A.3d at 362 (citing Md. Code Ann., Cts. & Jud. Proc. § 6-405 (allowing parents to settle "any" claims on behalf of minors without court approval)). Clearly, the legal framework in Tennessee differs significantly from these other jurisdictions in this regard.

In addition, unlike in *Sharon* and *Zivich*, Sky High has cited to no statutes, nor has our research revealed any, that reflect Tennessee public policy in favor of sheltering from liability owners of land opened for recreational uses or unpaid athletic coaches and

sponsors. *See Sharon*, 769 N.E.2d at 747 (citing Mass. Gen. Laws Ann. ch. 21, § 17C; Mass. Gen. Laws Ann. ch. 231, § 85V); *Zivich*, 696 N.E.2d at 204–05 (citing Ohio Rev. Code Ann. §§ 1533.18; 1533.181; 2305.381; 2305.3825); Indeed, in Justice Deborah L. Cook's concurrence in *Zivich*, she emphasized that her decision to concur was "firmly grounded in the public policy of the General Assembly, as evinced by the legislative enactments cited by the majority," rather than any constitutional policy regarding parental rights. *Zivich*, 696 N.E.2d at 208 (Cook, J., concurring). Tennessee law has no such statutes that evince the Tennessee General Assembly's desire to shield the operators of for-profit trampoline parks from liability.

Based on the foregoing, we conclude that the Colorado Supreme Court's analysis on this issue best aligns with existing Tennessee law. *See Cooper*, 48 P.3d at 1235 n.11. First, we note that Sky High has cited no law in which the fundamental right to care for and to control children, as recognized by the Tennessee Supreme Court in *Hawk*, has ever been utilized to uphold financial contracts entered into by the parent on behalf of the child, especially where the child's right to recover money may be negated by the parents' agreement. *See id.* (holding that "[a] parental release of liability on behalf of his child is not a decision that implicates such fundamental parental rights"). Indeed, where a child's financial interests are threatened by a parent's contract, it appears to be this State's long-standing policy to rule in favor of protecting the minor. *See Huntley*, 61 S.W.3d at 336 (preventing parent from agreeing to waive child support). Moreover, as previously discussed, our General Assembly has enacted a multitude of statutes evincing a policy of protecting children's finances from improvident decisions on the part of their parents. *See, e.g.*, Tenn. Code Ann. §§ 34-1-102; 34-1-121(b). This policy of allowing courts to "assume a special responsibility to protect a minor's interests" was reaffirmed by the Tennessee Supreme Court in 2011, well after the decisions in both *Hawk* and *Troxel*. *See Wright*, 337 S.W.3d at 178. Accordingly, parents in Tennessee, like parents in Colorado, simply do not have plenary power over the claims of their children, regardless of their fundamental parental rights. *C.f. Cooper*, 48 P.3d at 1235 n.11 (holding that a parent's right to the custody, care, and control of his or her children is "not absolute").[8]

We are cognizant that that above statutes as well as the *Wright* decision concern only the parent's ability to settle a claim after an injury has occurred. *See Wright*, 337 S.W.3d at 178. At least two courts have held that similar rules have no application to a pre-injury waiver. *See Sharon*, 769 N.E.2d at 747 n.10 (citing Mass. Gen. Laws Ann. ch. 231, § 140C 1/2) (providing that a court may approve a settlement on behalf of a minor when approval is requested by a party); *Zivich*, 696 N.E.2d at 201. As the *Sharon* Court explained:

---

[8] Moreover, unlike the Colorado legislature, which enacted new law to overturn the decision in Cooper a mere year after that decision was filed, *see* Colo. Rev. Stat. Ann. § 13-22-107 (eff. May 14, 2003), the Tennessee General Assembly has chosen to take no action to overturn the rule adopted in *Childress* for the last twenty-five years.

[T]he policy considerations underlying [a post-injury release] are distinct from those at issue in the preinjury context. A parent asked to sign a preinjury release has no financial motivation to comply and is not subject to the types of conflicts and financial pressures that may arise in the postinjury settlement context, when simultaneously coping with an injured child. Such pressure can create the potential for parental action contrary to the child's ultimate best interests. In short, in the preinjury context, there is little risk that a parent will mismanage or misappropriate his child's property.

*Sharon*, 769 N.E.2d at 747 n.10 (citing *Zivich*, 696 N.E.2d 201). This Court previously rejected a similar argument in *Childress*, stating:

Indemnification agreements executed by a parent or guardian in favor of tort feasors, actual or potential, committing torts against an infant or incompetent, are invalid as they place the interests of the child or incompetent against those of the parent or guardian. . . . Th[e] fact [that] the agreements at issue were executed pre-injury] does not change the rule, and indemnity provisions executed by the parent prior to a cause of action in favor of a child cannot be given effect. Were the rule otherwise, it would circumvent the rule regarding exculpatory clauses and the policy of affording protection in the law to the rights of those who are unable effectively to protect those rights themselves.

*Childress*, 777 S.W.2d at 7 (citing *Valdimer*, 172 N.E.2d at 285 ("Clearly, a parent who has placed himself in the position of indemnitor will be a dubious champion of his infant child's rights.")).

Nothing in *Hawk* or otherwise cited to this Court leads us to believe that the decision in *Childress* on this particular issue was in error at the outset or has been changed by the fundamental parental rights doctrine. An agreement to waive all future claims arising out of an incident and to hold a third party harmless even from the third party's negligence clearly has the potential to place the parent's interest in conflict with the child's interest. As the New Jersey Superior Court explained: "If such an agreement could be enforced it would be for the benefit of the [parent] to prevent the bringing of any suit on the claim of the infant no matter how advantageous such suit might be for the infant." *Fitzgerald*, 267 A.2d at 559. The Oregon Supreme Court came to a similar conclusion:

As parent-guardian he owes a duty to act for the benefit of his child. That duty is not fully discharged where the parent enters into a bargain which gives rise to conflicting interests. The conflict may

- 31 -

arise at the time of settlement when the parent has the opportunity to receive a sum of money in his own right as a part of the settlement in consideration for which he agrees to indemnity the defendant, and it may arise later when it is found advisable that his child bring action against the defendant for injuries which had not been known at the settlement date. On either of these occasions there is a real danger that the child's interest will be put in jeopardy because of the parent's concern over his or her own economic interests. Certainly a parent who is called upon to decide whether his child should bring an action for injuries not known at the time of settlement is not likely to proceed with such an action in the face of knowledge that any recovery eventually will result in his own liability under an indemnity agreement.

*Mallison*, 354 P.2d at 802. The parent-child relationship has likewise been described as fiduciary by Tennessee courts in some situations. *See Bayliss v. Williams*, 46 Tenn. 440, 442 (1869) ("The relation may be of any kind which implies confidence, as trustee and beneficiary, attorney and client, parent and child, guardian and ward, physician and patient, nurse and invalid, confidential friend and adviser, indeed, any relation of confidence between persons which give one dominion or influence over the other[.]"); *see also Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn. Ct. App. 1974) (noting that while the parent-child relationship may give rise to a fiduciary duty, that does not necessarily mean that the relationship is confidential for purposes of undue influence or other legal questions). Accordingly, we agree with the courts in New Jersey, New York, and Oregon that the conflict requiring court approval of post-injury settlements involving minors is largely equal to the conflict created by a parent's decision to sign a pre-injury waiver on behalf of a minor.

Furthermore, in our view, a pre-injury waiver is largely analogous to a contract containing a contingency fee. In the context of a pre-injury waiver, the parent must weigh the benefit of the activity with potential injury that may occur, but the injury is merely hypothetical at that time. Likewise, when a parent signs a contingency fee agreement, the parent must weigh the benefits of the representation against the attorney's fees that will be owed from the child's recovery. At the time of the signing of the agreement, however, such recovery is merely hypothetical. Accordingly, similar interests and conflicts are inherent in both transactions. Because the Tennessee Supreme Court has held that contingency fee agreements signed by parents are invalid, despite the fact that no statute expressly prohibits such action, *see Wright*, 337 S.W.3d at 178, we likewise conclude that pre-injury waivers of liability and indemnification agreements are unenforceable under Tennessee law.

Finally, we cannot discount the fact that Tennessee's public policy may also be determined from our case law. *See **Baby***, 447 S.W.3d at 823. As previously discussed, this Court determined in 1989 that contracts such as the one at issue in this case were unenforceable under Tennessee law. *See **Childress***, 777 S.W.2d at 6. This Court has previously grappled with the question of whether our Opinions, published in the official reporter and denied permission to appeal by the Tennessee Supreme Court, are entitled to stare decisis effect. *Compare **Evans v. Steelman***, No. 01-A-01-9511-JV00508, 1996 WL 557844, at *2 (Tenn. Ct. App. Oct. 2, 1996), *aff'd*, 970 S.W.2d 431 (Tenn. 1998) (holding that where only one issue was decided by the Court of Appeals, the denial of permission to appeal by the Tennessee Supreme Court should be read as approval of the Court of Appeals's holding until the Tennessee Supreme Court "change[s] its mind"); *with **Evans***, 1996 WL 557844, at *8 (Koch, J., *dissenting*) (citing ***Swift v. Kirby***, 737 S.W.2d 271, 277 (Tenn. 1987)) ("The doctrine of stare decisis does not apply with full force to principles that have not been directly adopted by the Tennessee Supreme Court."); *see also **Hardy v. Tournament Players Club at Southwind, Inc.***, No. W2014-02286-COA-R9-CV, 2015 WL 4042490, at *16 (Tenn. Ct. App. July 2, 2015) (Gibson, J., dissenting), *perm. app. granted* (Tenn. Dec. 9, 2015) (noting the "the oddity of a Court of Appeals judge asserting that our own opinions may not have stare decisis effect[,]" in the context of an unpublished opinion of the Court of Appeals). If entitled to consideration under the stare decisis doctrine, we are "require[d] . . . to uphold our prior precedents to promote consistency in the law and to promote confidence in this Court's decisions . . . [unless there is] an error in the precedent, when the precedent is obsolete, when adhering to the precedent would cause greater harm to the community than disregarding stare decisis, or when the prior precedent conflicts with a constitutional provision." ***Cooper v. Logistics Insight Corp.***, 395 S.W.3d 632, 639 (Tenn. 2013).

It appears that the issue was settled, however, by the Tennessee Supreme Court's 1999 amendment to Rule 4 of the Rules of the Tennessee Supreme Court. *See In re Amendment to Supreme Court Rule 4* (Tenn. Nov. 10, 1999), https://www.tncourts.gov/sites/default/files/sc_rule_4_amd_publ_opin.pdf (deleting the prior rule and adopting a new rule). Under Rule 4 of the Rules of the Tennessee Supreme Court, "[o]pinions reported in the official reporter . . . shall be considered controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction." Accordingly, regardless of whether stare decisis applies in this case, it remains controlling authority in this case until overturned. As such, we will not overrule the ***Childress*** decision lightly, especially given the over twenty-five years that it has operated as the law in Tennessee.

A similar issue was raised in ***Woodman ex rel. Woodman v. Kera LLC***, 486 Mich. 228, 785 N.W.2d 1 (Mich. 2010). As previously discussed, the Michigan Supreme Court first recognized the well-settled rule that "a parent has no authority to waive, release, or compromise claims by or against a child[.]" ***Id.*** at 8. The ***Woodman*** Court therefore framed the issue as whether that well-settled rule should be altered due to changing

policy considerations. The Michigan Supreme Court declined the invitation, holding that such a dramatic shift in public policy was best left to the state legislature:

> There is no question that, if this Court were inclined to alter the common law, we would be creating public policy for this state. Just as "legislative amendment of the common law is not lightly presumed," this Court does not lightly exercise its authority to change the common law. Indeed, this Court has acknowledged the prudential principle that we must "exercise caution and . . . defer to the Legislature when called upon to make a new and potentially societally dislocating change to the common law."

*Woodman*, 785 N.W.2d at 9 (footnotes omitted) (quoting *Wold Architects & Engineers v. Strat*, 474 Mich. 223, 233, 713 N.W.2d 750 (Mich. 2006); *Henry v. Dow Chem. Co.*, 473 Mich. 63, 89, 701 N.W.2d 684 (Mich. 2005)) (citing *Bott v. Commission of Natural Resources*, 415 Mich. 45, 327 N.W.2d 838 (Mich. 1982)).

The same is true in this case. As previously discussed, the *Childress* Opinion was decided over twenty-five years ago. Since that time, both the Tennessee Supreme Court and the Tennessee General Assembly have had ample opportunity to affirmatively act to change the rule established in *Childress*. *See Childress*, 777 S.W.2d at 1 (noting that permission to appeal to the Tennessee Supreme Court was denied); *Rogers v*, 807 S.W.2d at 242 (same). Indeed, the *Childress* Opinion specifically invited both the Tennessee Supreme Court and the Tennessee General Assembly to scrutinize its holding. *See Childress*, 777 S.W.2d at 8. Despite this fact, the *Childress* rule has remained unaltered for more than two decades.

Other courts have questioned the danger presented to recreational activities participated in by minors in refusing to enforce liability waivers or exculpatory agreements. *See, e.g.*, *Sharon*, 769 N.E.2d at 747 (holding that declining to enforce these waivers would "inevitably [be] destructive to school-sponsored programs"); *Zivich, Inc.*, 696 N.E.2d at 205 (noting the threat that recreational activities will not be available to children without the enforcement of waivers). Indeed, even the *Childress* Court noted that possible threat posed by its ruling. *See Childress*, 777 S.W.2d at 7–8 (discussing whether its rule will have a chilling effect on recreational activities for children). Given the twenty-five years under which Tennessee has been applying the rule adopted in *Childress*, however, we need not speculate as to the dire consequences that may result to children's recreational opportunities. Indeed, Tennessee law is replete with instances of children participating in, and becoming injured by, recreational activities. *See, e.g.*, *Neale v. United Way of Greater Kingsport*, No. E2014-01334-COA-R3-CV, 2015 WL 4537119, at *1 (Tenn. Ct. App. July 28, 2015) (involving a child injured in a woodworking shop operated by the Boys and Girls Club); *Pruitt v. City of Memphis*, No. W2005-02796-COA-R3-CV, 2007 WL 120040, at *1 (Tenn. Ct. App. Jan. 18, 2007) (involving a child injured at a public swimming pool); *Tompkins v. Annie's Nannies,*

*Inc.*, 59 S.W.3d 669 (Tenn. Ct. App. 2000) (involving a child injured in a downhill race organized by her day care center); ***Livingston, as Parent, Next Friend of Livingston v. Upper Cumberland Human Res. Agency***, No. 01A01-9609-CV-00391, 1997 WL 107059, at *1 (Tenn. Ct. App. Mar. 12, 1997) (involving a child injured at a church retreat); ***Cave v. Davey Crockett Stables***, No. 03A01-9504CV00131, 1995 WL 507760, at *1 (Tenn. Ct. App. Aug. 29, 1995) (involving a child injured at summer camp).[9] In fact, Sky High has provided this Court with no evidence that recreational activities open to minors have in any way been hindered by the ***Childress*** rule. Accordingly, we can easily dismiss any claim that refusing to enforce waivers of liability against children will in any way limit the recreational opportunities open to children in Tennessee.

Based on the foregoing, we conclude that there is no basis to depart from this Court's well-reasoned decision in ***Childress***. Because the law in Tennessee states that parents may not bind their minor children to pre-injury waivers of liability, releases, or indemnity agreements, the trial court did not err in refusing to enforce the waiver of liability and indemnity provisions of the release signed by Mother on behalf of Son.

## IV.

Appellants next argue that the trial court erred in denying their request to amend their complaint to include a request for pre-majority medical expenses incurred on behalf of the child. Here, the trial court specifically found that "for a minor's injuries[,] the claim for medical expenses [is] a separate and distinct claim of the parent[.]" According to the trial court, because Mother waived her right to recover from Sky High, Mother "could not effectively assign them or waive them to her son to allow him to pursue them." The trial court therefore partially denied Appellants' motion to amend their complaint.

As previously discussed, a trial court's decision on a motion to amend a pleading is reviewed under an abuse of discretion standard. ***Fann v. City of Fairview***, 905 S.W.2d 167, 175 (Tenn.Ct.App.1994). Rule 15.01 of the Tennessee Rules of Civil Procedure provides that leave of court to amend pleadings "shall be freely given when justice so requires." The Tennessee Supreme Court has recognized that the language of Rule 15.01 "substantially lessens the exercise of pre-trial discretion on the part of a trial judge." ***Branch v. Warren***, 527 S.W.2d 89, 91 (Tenn. 1975); *see also* ***Hardcastle v. Harris***, 170 S.W.3d 67, 80–81 (Tenn. Ct. App. 2004). In considering a motion to amend, a trial court is to consider several factors, including: "undue delay in filing the amendment, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and the futility of the amendment." ***Gardiner v. Word***, 731 S.W.2d 889, 891–92 (Tenn. 1987).

---

[9] In ***Cave***, the child's parent signed "a consent [form] for the child to participate in the activity and . . . a release releasing [one of the defendants] from any liability for personal injuries received by the child." *Id.* at *1. The Court never reached the issue, however, because of a statute that precluded liability for certain equine activities. *Id.* (citing Tenn. Code Ann. § 44-20-103).

Although not termed as such by the trial court, it appears to this Court that the trial court denied Appellants' motion to alter or amend on the basis of futility—that is, because Son could not recover pre-majority medical expenses even if requested in the complaint, the amendment served no purpose.[10] Sky High argues that the trial court was correct in its decision, citing the Tennessee Supreme Court's decision in **Dudley v. Phillips**, 218 Tenn. 648, 651, 405 S.W.2d 468 (Tenn. 1966). In **Dudley**, the Tennessee Supreme Court held that when a child is injured, two "separate and distinct causes of action" are created: (1) a cause of action on behalf of the parent for "loss of services [and] medical expenses to which [the parent] will be put"; and (2) "another and distinct cause of action arises in favor of the child for the elements of damage to him, such as pain and suffering, disfigurement, etc." **Id.** at 469 (quoting 42 A.L.R. 717 (originally published in 1926)). The rule expressed in **Dudley** has been reaffirmed by Tennessee courts on multiple occasions. See **Vandergriff v. ParkRidge E. Hosp.**, 482 S.W.3d 545, 549 (Tenn. Ct. App. 2015); **Neale v. United Way of Greater Kingsport**, No. E2014-01334-COA-R3-CV, 2015 WL 4537119, at *5 (Tenn. Ct. App. July 28, 2015); **Luther, Anderson, Cleary & Ruth, P.C. v. State Farm Mut. Auto. Ins. Co.**, No. 03A01-9601-CV-00015, 1996 WL 198233, at *3 (Tenn. Ct. App. Apr. 25, 1996); **Rogers v. Donelson-Hermitage Chamber of Commerce**, 807 S.W.2d 242, 247 (Tenn. Ct. App. 1990)). Indeed, the rule has been codified into Tennessee's statutory law at Tennessee Code Annotated section 20-1-105, which provides, in relevant part: "The father and mother of

---

[10] We note that this Court has previously held:

> The court . . . should not deny a plaintiff's Tenn. R. Civ. P. 15 Motion to Amend based on an examination of whether it states a claim on which relief can be granted. As the United States Supreme Court explained, "[i]f underlying facts or circumstances relied on by plaintiff may be proper subject of relief, he ought to be afforded opportunity to test his claim on merits and therefore should be permitted to amend complaint." **Foman v. Davis**, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962). If the legal sufficiency of the proposed Complaint is at issue—instead of delay, prejudice, bad faith or futility—the better protocol is to grant the motion to amend the pleading, which will afford the adversary the opportunity to test the legal sufficiency of the amended pleading by way of a Tenn. R. Civ. P. 12.02(6) Motion to Dismiss. See **McBurney v. Aldrich**, 816 S.W.2d 30, 33 (Tenn. Ct. App. 1991).

**Conley v. Life Care Centers of Am., Inc.**, 236 S.W.3d 713, 724 (Tenn. Ct. App. 2007). Here, it does appear that the trial court judged the merits of Son's claim for pre-majority expenses in denying Appellants' motion to alter or amend. If we were to remand to the trial court with directions to grant the amendment, it is likely that the trial court would later grant a motion to dismiss this claim on the same basis that it denied the motion to amend. Consequently, we cannot discern how judicial economy would be furthered by requiring the above procedure. Furthermore, this Court in its order granting the interlocutory appeal specifically indicated that the question of "whether the minor child can recover medical expenses on his own behalf" was "appropriate" for interlocutory review. Accordingly, we proceed to consider the merits of this issue.

a minor child have equal rights to maintain an action for the expenses and the actual loss of service resulting from an injury to a minor child in the parents' service or living in the family . . . ." Tenn. Code Ann. § 20-1-105(a).

Sky High argues that because Mother's claims were extinguished by her valid and undisputed execution of the waiver and indemnification language in the release, any claim for pre-majority medical expenses is likewise barred. Appellants agree that Mother has waived "her individual right to recover medical expenses incurred by her son." Indeed, all of Mother's individual claims were voluntarily dismissed in the trial court. Appellants also do not dispute the general rule that children may not claim pre-majority medical expenses as a measure of damages in the child's lawsuit because those damages are owed solely to the parents. *See* **Dudley**, 405 S.W.2d at 469; *see also* **Burke** v. **Ellis**, 105 Tenn. 702, 58 S.W. 855, 857 (Tenn. 1900) ("It is not alleged or shown that the boy incurred any expense for medical services. It is alleged these were incurred by the father. Such an element was not proper in estimating the damages in a case brought like this, by next friend, for the minor[.]"). Instead, Appellants argue that because Mother waived her claims by signing the release, the child is permitted to claim the medical expenses on his own behalf, with Mother acting in her capacity as next friend.

In support of their argument, Appellants cite the Tennessee Supreme Court's decision in **Wolfe v. Vaughn**, 177 Tenn. 678, 152 S.W.2d 631 (Tenn. 1941). In **Wolfe**, the minor was injured in an automobile accident. Because her mother was deceased and her father incompetent, the minor filed suit with her grand uncle acting as next friend. **Id.** at 633. The jury eventually awarded the minor plaintiff damages, including pre-majority medical expenses. **Id.** at 632. On appeal, the defendants argued that the minor could not recover those expenses "the insistence being that the law confers no cause of action upon an infant for such expenses." **Id.** at 633. The Tennessee Supreme Court agreed with the defendant's contention generally, noting:

> "Since the parent is entitled to the services and earnings of the child so long as the latter is legally under his custody or control, ordinarily an infant suing for personal injuries cannot recover for the impairment of his earning capacity during infancy, or for loss of time, or for expenses in curing his injuries, when, and only when, he is under the control of his parents; after emancipation he may do so. However, he may recover for his mental or physical pain and sufferings, his permanent injuries, and for the impairment of his power to earn money after arriving at majority."

**Id.** at 634 (quoting 31 C. J. 1114, 1115). The **Wolfe** Court held, however, that an exception to the rule should be present "where a child has no parent who can sue for such expenses that she can sue for and recover the same." **Wolfe**, 152 S.W.2d at 634. Accordingly, the Tennessee Supreme Court adopted the following rule:

"A parent may waive or be estopped to assert his right to recover for loss of services, etc., by reason of injury to his minor child, and permit the child to recover the full amount to which both would be entitled, as where the parent as next friend brings an action on behalf of the child for the entire injury, or permits the case to proceed on the theory of the child's right to recover for loss of services and earning capacity during minority. In such case the parent treats the child as emancipated in so far as recovery for such damages is concerned, and cannot thereafter be permitted to claim that he, and not the child, was entitled to recover therefor."

*Id.* at 633–34 (quoting 46 C. J. 1301, 1302).

This Court has considered the rule set down in *Wolfe* on a number of occasions. *See Neale v. United Way of Greater Kingsport*, No. E2014-01334-COA-R3-CV, 2015 WL 4537119, at *8 (Tenn. Ct. App. July 28, 2015); *Palanki ex rel. Palanki v. Vanderbilt Univ.*, 215 S.W.3d 380 (Tenn. Ct. App. 2006); *Smith v. King*, No. CIV.A. 958, 1984 WL 586817 (Tenn. Ct. App. Sept. 21, 1984). In *Smith*, the child, with his parent acting in the capacity of next friend, filed suit to recover for her injuries incurred when she was struck by a car. *Smith*, 1984 WL 586817, at *1. Because the parent's claim was barred by the applicable statute of limitations, the child sought to recover not only the damages owed to him, but also for pre-majority medical expenses. *Id*. In *Smith*, we held that based upon a theory of waiver, as set down in *Wolfe*, "under circumstances where the parent has acted as next friend," the child "may maintain an action for his medical expenses provided that he has paid them, as suggested in *Burke*, or is legally obligated to pay them." *Smith*, 1984 WL 586817, at *2 (citing *Burke*, 58 S.W. at 857 (holding that it was error for the trial court to allow evidence of pre-majority medical expenses that were paid by the child's parent)). The Smith court therefore remanded to determine "whether the child could bring herself within the exception to the general rule[.]" *Id.* The *Smith* Court, however, was not abundantly clear as to who was actually required to have paid the expenses, the child or the parent, in order for the child to recover those damages in his or her suit.

The question was answered by this Court in *Palanki ex rel. Palanki v. Vanderbilt Univ.*, 215 S.W.3d 380 (Tenn. Ct. App. 2006), *no perm. app. filed*. Like the child in *Smith*, the child in *Palanki* filed suit through his next friend. Although the parents' claim was not barred by the statute of limitations, the child in *Palanki* nevertheless requested medical expenses incurred while he was a minor. *Id.* at 384. This Court held that the child "could properly maintain his own action for pre-majority medical expenses incurred or likely to be incurred by [the child's mother] on his behalf[.]" *Id.* at 394. In reaching this result, this Court in *Palanki* characterized the rule "adopted" in *Smith* as allowing "a child under circumstances where the parent has acted as next friend [to] maintain an action for his medical expenses provided that [the parent] has paid for them . . . or is

legally obligated to pay them." *Id.* (alteration in original) (quoting *Smith*, 1984 WL 586817, at *2).[11] This Court therefore held that evidence regarding the child's pre-majority medical expenses was properly admitted and considered by the jury. *Id.* at 394.

Recently, the United States District Court for the Eastern District of Tennessee called into question the holding in *Palanki*. *See Grant v. Kia Motors Corp.*, No. 4:14-CV-79, 2016 WL 6247319 (E.D. Tenn. May 10, 2016).[12] In *Grant*, the minor children were injured in an automobile accident, and the children's mother filed suit in her capacity as next friend. *Id.* at *1. The district court, relying on *Dudley*, first ruled that any claims brought by the mother individually were not tolled due to the children's minority. *Id.* at *8 (citing Tenn. Code Ann. § 29-28-103(a)) (containing an express tolling provision applicable to minors). Because the mother filed her action after the expiration of the statute of repose, her claims were barred. *Grant*, 2016 WL 6247319, at *9.

The mother argued, however, that given that her individual claims were barred, her children were able to pursue pre-majority medical expenses under the theory of waiver espoused in *Palanki*. *Id.* The district court noted that under the interpretation of the waiver rule adopted in *Palanki*, Tennessee's intermediate courts "would likely permit the minor Plaintiffs in this action to bring claims for their pre-majority medical expenses through their mother . . . as next friend." *Id.* Under well-settled rules regarding federal courts sitting in diversity, the *Grant* court noted that it "must follow state law as announced by the Supreme Court of Tennessee[,]" and "[w]here, as here, 'a state appellate court has resolved an issue to which the high court has not spoken, we will normally treat [those] decisions . . . as authoritative absent **a strong showing** that the state's highest court would decide the issue differently.'" *Id.* (quoting *Kirk v. Hanes Corp. of North Carolina*, 16 F.3d 705, 707 (6th Cir. 1994) (emphasis in original)). Based upon its reading of *Wolfe* and *Smith*, however, the district court stated that it was "convinced that the Supreme Court of Tennessee would not apply the waiver rule as announced in *Palanki* to the case at bar." *Grant*, 2016 WL 6247319, at *9. Specifically, the *Grant* court concluded that the *Palanki* Court wrongly interpreted the ambiguous language in *Smith* to allow a child to sue for expenses paid by the child's parent when the opposite rule was intended by the *Smith* Court. *Id.* at *10 (citing *Palanki*, 215 S.W.3d at 394 (citing *Smith*, 1984 WL 586817, at *2)).

In reaching this conclusion, the district court first referenced the Tennessee Supreme Court's ruling in *Wolfe*, noting that "the *Wolfe* court clearly addressed a

---

[11] The *Palanki* Court inexplicably states that this rule was adopted in *Smith* with no citation of any kind to the Tennessee Supreme Court's seminal decision in *Wolfe*, upon which the *Smith* Court bases its analysis.

[12] Although federal interpretations of Tennessee law are not controlling on this Court, we may consider their analysis helpful in appropriate circumstances. *See State v. Hunt*, 302 S.W.3d 859, 863–64 (Tenn. Crim. App. 2009) ("[A] federal court's interpretation of Tennessee law is not binding on the courts of this state.").

situation in which the parents neither paid for nor were legally responsible for the child's medical expenses." *Grant*, 2016 WL 6247319, at *10. The court in *Grant* likewise concluded that the Court of Appeals in *Smith* was concerned only with those expenses paid by the minor himself. *Id.* at 11. In support, the district court noted that the proviso in the *Smith* Court's holding that a claim for pre-majority medical expenses may stand "provided he has paid them," cites the Tennessee Supreme Court's decision in *Burke v. Ellis*. *Grant*, 2016 WL 6247319, at *11 (citing *Smith*, 1984 WL 586817 at *2 (citing *Burke*, 58 S.W. at 857)). In *Burke*, the Tennessee Supreme Court ruled that the trial court erred in allowing evidence of pre-majority medical expenses in a case brought by the minor through his next friend. *Burke*, 58 S.W. at 857. Indeed, the *Burke* Court mentioned that there was no proof that the child was required to pay his own medical expenses. *Id.* ("[W]hile there is no proof that the child paid any expenses for medical treatment, there is a statement that such expenses were incurred and paid by the father[.]"). As such, the *Grant* court concluded that:

> *Burke* unmistakably stands for the proposition that it is improper for a jury to consider medical expenses as relevant to damages where, as here, a minor brings claims by next friend. Moreover, by explicitly mentioning twice that there is no proof that the child paid any expenses for medical treatment, the court implies that the outcome may be different if such proof were presented. Accordingly, where the *Smith* court says that the waiver rule applies to permit a child to recover medical expenses "provided that he has paid them, as suggested in *Burke*," *Smith*, 1984 WL 586817 at *2, it is clear that the "he" to which the Smith court referred was intended to be "the child."

*Grant*, 2016 WL 6247319, at *11.

The *Grant* court also noted other portions of the ruling in *Smith* that supported its interpretation. For example, the *Smith* court cited two cases regarding the question of when a child is liable for necessaries furnished to him. *Id.* (citing *Smith*, 1984 WL 586817 at *2 (citing *Gardner v. Flowers*, 529 S.W.2d 708 (Tenn. 1975); *Foster v. Adcock*, 161 Tenn. 217, 30 S.W.2d 239 (Tenn. 1930)). In both of these cases, however, the dispute involved whether a child, not the child's parent, was liable on a debt. *See Grant*, 2016 WL 6247319, at *11 (citing *Gardner*, 529 S.W.2d at 711; *Foster*, 30 S.W.2d at 240). Additionally, the *Grant* court noted that the remand order in *Smith* indicates that the only pre-majority medical expenses that may be raised by the child are those that were paid by him or her. *See Grant*, 2016 WL 6247319, at *12 ("It is clear . . . that the court remanded the case so that the minor plaintiff could present evidence that she, the child, had paid the medical expenses or was legally obligated to pay same."). Indeed, the *Smith* Court remanded to the trial court to determine "whether the child could bring herself within the exception to the general rule[,]" despite the fact that the record contained evidence that the father was billed for the child's medical expenses. *Smith*,

1984 WL 586817 at *2. Were the rule in **Smith** that the child could bring a claim for pre-majority medical expenses paid by him or his parent, a remand would not have been necessary to ascertain whether the child could "bring herself within the [waiver] rule." *See* **id.**

Finally, the **Grant** court noted two other considerations that required it to depart from this Court's holding in **Palanki**: (1) the purpose of the waiver rule was allow a claim where there was no threat of double recovery; and (2) accepting the **Palanki** interpretation of the waiver rule would "allow a parent to collect as damages his/her child's pre-majority medical expenses notwithstanding the fact that the parent's individual claims are barred." **Grant**, 2016 WL 6247319, at *12. The **Grant** court concluded that such a result was untenable because it blurred the demarcation between the parent's claims and the child's claims and permitted the parent to evade the fact that his or her own claim was barred. **Id.**

Although it is certainly unusual for this Court to depart from the most recent reported Tennessee case on this subject in favor of an interpretation offered by a federal district court, we must agree with the Court in **Grant** that the child in this case should not be able to claim pre-majority expenses paid by his parents in an effort to circumvent Mother's execution of the release, including its waiver and indemnity provision. First, we note that although the **Palanki** decision is reported in the official reporter and therefore "controlling for all purposes," Tenn. R. Sup. Ct. 4(g)(2), **Palanki** was published pursuant to Rule 11 of the Rules of the Tennessee Court of Appeals, where no application for permission to appeal to the Tennessee Supreme Court was filed. *See* **Palanki**, 215 S.W.3d at 380; *see also* Tenn. R. Ct. App. 11. As previously discussed, there is some question as to whether opinions of the Tennessee Court of Appeals which have been denied permission to appeal by the Tennessee Supreme Court are entitled to stare decisis effect. *See generally* **Evans v. Steelman**, No. 01-A-01-9511-JV00508, 1996 WL 557844, at *2, *8 (Tenn. Ct. App. Oct. 2, 1996). *But see* Tenn. R. Sup. Ct 4(g)(2). Regardless, the Tennessee Supreme Court has specifically held that:

> [W]hen no application for review of an opinion of the intermediate courts is sought, it has no stare decisis effect, and such an opinion cannot serve to modify or change existing law. The doctrine of sta[r]e decisis, especially as respects rules of property, does not apply with full force until the question has been determined by a court of last resort.

**Swift v. Kirby**, 737 S.W.2d 271, 277 (Tenn. 1987). As such, the decision in **Palanki** simply cannot serve to alter or change the decisions by the Tennessee Supreme Court in **Wolfe** and **Burke**. *See also* **Bloodworth v. Stuart**, 221 Tenn. 567, 572, 428 S.W.2d 786, 789 (Tenn. 1968) (citing **City of Memphis v. Overton**, 54 Tenn. App., 419, 392 S.W.2d 86 (Tenn.1964) ("The Court of Appeals has no authority to overrule or modify [the Tennessee] Supreme Court's opinions.")). **Morris v. Grusin**, No. W2009-00033-COA-

R3-CV, 2009 WL 4931324, at *4 (Tenn. Ct. App. Dec. 22, 2009) (quoting **Davis v. Davis**, No. M2003-02312-COA-R3-CV, 2004 WL 2296507, at *6 (Tenn. Ct. App. Oct. 12, 2004) ("Once the Tennessee Supreme Court has addressed an issue, its decision regarding that issue is binding on the lower courts.")); **Thompson v. State**, 958 S.W.2d 156, 173 (Tenn. Crim. App. 1997) (quoting **State v. Irick**, 906 S.W.2d 440, 443 (Tenn. 1995) ("[I]t is a controlling principle that inferior courts must abide the orders, decrees and precedents of higher courts. The slightest deviation from this rigid rule would disrupt and destroy the sanctity of the judicial process.")); **Levitan v. Banniza**, 34 Tenn. App. 176, 185, 236 S.W.2d 90, 95 (Tenn. Ct. App. 1950) ("This court is bound by the decisions of the Supreme Court."). Accordingly, to the extent that the decision in **Palanki** conflicts with either **Wolfe** or **Burke**, we are required to disregard it.

Furthermore, we agree with the **Grant** court's comment that in both **Smith** and **Wolfe**, the Court was concerned with the situation wherein the child himself paid the medical expenses. *See* **Grant**, 2016 WL 6247319, at *11–12 (citing **Wolfe**, 152 S.W.2d at 634; **Smith**, 1984 WL 586817 at *2). Indeed, in **Wolfe**, the child's parents were not at all involved in her life. **Wolfe**, 152 S.W.2d at 634. Accordingly to deprive her of the pre-majority medical expenses which she herself paid simply due to a legal fiction that all parents must pay for the pre-majority medical expenses of their children would have been fundamentally unfair. The **Smith** Court, likewise, indicated that the child, rather than the parent, must have paid the medical expenses and specifically cited the Tennessee Supreme Court's decision in **Burke** in announcing its rule. **Smith**, 1984 WL 586817 at *2. Again, **Burke** unequivocally held that the child could not present proof of pre-majority medical expenses paid by his parent. **Burke**, 58 S.W. at 857.

Interpreting the **Wolfe** waiver rule in this fashion best comports with Tennessee law. First, allowing the minor child to recover those expenses he himself has paid harmonizes with Tennessee's public policy of protecting the financial interests of minors. *See* discussion, *supra*. To hold otherwise would prevent the child from being fully compensated for the damages that he actually incurred based upon an arbitrary determination that those expenses were paid by the child's parent, even in the face of proof to the contrary. Furthermore, to allow the child in this case to claim Mother's damages despite the fact that she executed a valid release and indemnity agreement would be to frustrate this state's public policy of enforcing clear and unambiguous exculpatory agreements entered into freely by adults. *See* **Moss v. Fortune**, 207 Tenn. 426, 429, 340 S.W.2d 902, 903–04 (Tenn. 1960). Indeed, the **Smith** Court specifically confined the rule to only those claims that the parent "might have[.]" **Smith**, 1984 WL 586817 at *2. In this case, however, Mother's claims have been extinguished by her execution of the release. Accordingly, she has no claim that she may waive in favor of the child.

A recent Tennessee Supreme Court case supports our analysis. In ***Calaway ex rel. Calaway v. Schucker***, 193 S.W.3d 509 (Tenn. 2005), *as amended on reh'g in part* (Feb. 21, 2006), the child's mother filed a medical malpractice action in federal district court as next friend of her minor child. *Id.* at 512. There was no dispute that the mother's claims were barred by the applicable statute of repose. The dispute in the case concerned whether the child's claim was likewise barred by the statute of repose or whether the statutory time limit was tolled during the child's minority. *Id.* Because the dispute involved Tennessee law, the Tennessee Supreme Court accepted four certified questions from the federal court. *Id.* The Tennessee Supreme Court ultimately concluded that the medical malpractice statute of repose was not tolled by a child's minority but held that the rule would only be applied prospectively. *Id.* at 517–18. The ***Calaway*** Court thereafter answered the following certified question:

> Question 1: Does a minor child have a personal claim for medical expenses arising from an injury caused by the fault of another when the claim of the child's parent for such medical expenses is barred by a statute of limitation or repose?
>
> Answer: No.

*Id.* at 519. We acknowledge that this rule is offered with no elaboration and only expressly addresses the situation wherein a parent's claim is barred by a statute of limitation or repose. *Id.* Regardless, we find it highly persuasive that the Tennessee Supreme Court does not intend to allow a child to raise claims belonging to his parent simply because the parent cannot maintain his or her action, either because of the expiration of a statute of limitation or repose or the waiver of that claim through an exculpatory agreement.

Based on the foregoing, we conclude that Son cannot maintain an action for pre-majority medical expenses that were paid or will be paid by his parents. Rather, under the rule in ***Wolfe*** and ***Smith***, Son may only maintain an action for those medical expenses that he paid or is obligated to pay. Here, the motion to amend Appellants' complaint does not conclusively illustrate whether the requested damages constitute medical expenses paid by Son's parents or medical expenses paid by Son. Like the ***Smith*** Court, we are reluctant to hinder Son's ability to fully recover for his injuries. Accordingly, we reverse the trial court's ruling denying the motion to amend the complaint only so as to allow Appellants to raise a claim for those pre-majority medical expenses paid by Son or for which Son is obligated to pay. With regard to any pre-majority medical expenses paid by Son's parents, we affirm the trial court's order denying the motion to amend the complaint.

## Conclusion

The judgment of the Davidson County Circuit Court is reversed as to the motion to amend the complaint only to the extent of allowing Son to raise a claim for those pre-

majority medical expenses paid by Son or for which Son is obligated to pay. The judgment of the trial court is affirmed in all other respects. Costs of this appeal are taxed one-half to Appellants Crystal Blackwell as next friend to Jacob Blackwell, and their surety, and one-half to Appellee Sky High Sports Nashville Operations, LLC, for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE